
HARRY FINNEGAN AND MARY FINNEGAN, PLAINTIFFS-
APPELLANTS, v. HAVIR MANUFACTURING CORP., A
CORPORATION, DEFENDANT-RESPONDENT.

Argued January 25, 1972—Decided April 24, 1972.

414

*Mr. Alexander Avidan* argued the cause for the plaintiffs-appellants (*Messrs. Avidan & Avidan,* attorneys; *Mr. Alexander Avidan* on the brief).

*Mr. Wilbur A. Stevens* argued the cause for the defendant-respondent (*Messrs. Stevens & Mathias,* attorneys; *Mr. Wilbur A. Stevens* on the brief).

The opinion of the Court was delivered by

PROCTOR, J. This is a products liability case. Plaintiff Harry Finnegan was injured when his right hand was crushed by the ram of a power punch press he was operating for his employer, Arrow Metal Products (Arrow). Finnegan and his wife brought this suit for damages against Havir Manufacturing Corporation (Havir), as manufacturer, and Ralph Hochman & Co. and Wehrheim Machinery Co., as vendor and distributor of the punch press. The causes of action were grounded in negligence and strict liability. It was the plaintiffs' contention that the punch press was so dangerous in design that it should have been equipped with some form of safety device to protect the user while the machine was being operated. At the close of plaintiffs' case the three defendants moved for dismissal. The actions against Hochman and Wehrheim were dismissed by consent of counsel because there was no proof that they had sold or distributed the machine to Arrow. The motion by Havir was denied. At the end of the entire case Havir moved to dismiss and the trial court reserved decision and sent the case to the jury. Havir was found liable and Finnegan was awarded $28,555 and his wife $1,000. Thereafter Havir moved for judgment n.o.v. or a new trial. The trial court granted the motion for judgment n.o.v. Plaintiffs appealed to the Appellate Division and we certified the matter before argument there.

The punch press was manufactured by Havir in 1949 and sold that year to a hardware company in New York City. Subsequently, although the record does not disclose when or how, Arrow acquired the press. With the exception of a guard over the flywheel there were no safety devices of any kind on the machine when it was manufactured and shipped.

The press is a hand-fed machine of the single cycle type, As originally manufactured and sold it was activated by a

foot pedal which engages the clutch which in turn engages the ram and starts the machine in motion, causing the ram to descend forcibly upon a piece of metal which has been placed on a die. At the end of each cycle or operation the ram ascends to a position of rest.

In March, 1966 Finnegan had been employed by Arrow at Haskell, New Jersey, for about two months, working nights. During his employment he operated various machines. On March 11, 1966, Finnegan reported to work at 4:30 P.M. and was assigned to various jobs in the plant. At about 10:00 or 10:30 that evening his foreman assigned him to work on the Havir punch press. Finnegan testified that he had never before operated a punch press. He said that the foreman demonstrated what he was to do, watched him operate the press two or three times and said, "all right" and left.

Finnegan was directed to deburr aluminum discs about 4″ x 6″ x 1/8″ thick. He said he sat in front of the machine, took a disc from a box on the right, placed it with his right hand on the die and stepped on a foot pedal which activated the machine. The ram would come down about two inches, stamping the disc and removing burrs from around the circumference. After this operation the ram would ascend and Finnegan would remove the disc with his left hand and place it in a box to his left. He estimated that he stamped six or eight pieces a minute during the time he operated the press. At about midnight his right hand was caught between the ram and die, resulting in the later amputation of two fingers and damage to a third. Finnegan was not clear as to what stage of the operation he was performing when the accident occurred.

John Salice, the foreman, testified in behalf of plaintiffs. He said that after demonstrating the use of the machine he told Finnegan, "I will be right back" and left. He said he went to get long pliers or tongs so that Finnegan would not have to put his hands under the ram. Although in a pretrial deposition the foreman had stated that he told Finnegan

he was going for the tongs and instructed him to wait until he returned, at the trial he was unsure whether or not he actually said those things to Finnegan.

Salice further testified that sometime after Finnegan's injury Arrow installed a two-hand push-button safety device which necessitates the placement of each of the operator's hands on buttons away from the die area in order to activate the machine. He said that this procedure "considerably" slows up work.

Plaintiffs' expert, Harold Nickelsporn, a consulting engineer, testified that the machine had no safety devices when it was manufactured and none were installed before the accident. He said that prior to the accident the mechanical foot pedal which was installed by the manufacturer and was depressed to activate the machine had been replaced by an electrical foot pedal. In his opinion the accident was caused by a lack of coordination in tripping the foot pedal, together with the dangerous character of the machine, i. e., the absence of safety devices to prevent the operator from placing his hands beneath the ram when the press is activated. He said the press deviated from manufacturer's standards of safety in 1949 because it was made without safety devices or without warnings to the operator posted on the machine.

Nickelsporn stated that there were several safety devices available in 1949. He described two types. One was the push-button device which has two buttons so spaced as to require the operator to place each hand on a button away from the die area to set the machine in motion. He said that installation by the manufacturer of such a device would be a simple operation, and not a costly one. The other guard was a sweep device to prevent the operator's hands from entering the area between the ram and die when the press was activated.

On cross-examination when asked which of the safety devices he had mentioned should have been installed in 1949 by the manufacturer on presses like the one in question Nickelsporn said, "As a minimum a two hand device . . . ."

He stated, "[T]he least precaution the manufacturer should provide is a two hand button device which was well-known and would take care of any application of the press." In response to an inquiry as to what course the manufacturer should take if the buyer didn't want a safety device but wanted to put on his own, the expert said that a safety guard "should not be permitted to be added as an afterthought in a haphazard fashion by someone else." He also said that the push buttons could be turned off and the press would be operated by a foot pedal.

Nickelsporn conceded that certain companies which manufacture punch presses did not put safety devices on the machines. However, he testified that one company, Walsh Presses, which, in addition to power presses manufactures safety devices, installs push-buttons on presses and that these push buttons were advertised in the company's catalog as "ideal for all types of power press work . . . ."

Nickelsporn also pointed out that one manufacturer, Federal, currently installs the push-button device at the time the press is made.

Ralph Hochman, a dealer in metal working machinery and originally a defendant in this action, was called by the defendant. He testified that in 1949 it was the practice of the industry for the manufacturer to sell a press without any point of operation safety devices which prevent the operator from placing his hands under the ram when the machine is activated. As a dealer he does not and, in 1949, did not supply such safety devices with power presses. On cross-examination Hochman said he did not know if the push-button device would interfere with the operation of the punch press because he did not know all the "facts."

Defendant's expert, Isaac Stewart, a consulting engineer, testified that the design of the press in question was "fine." He said that the change in the activating mechanism of the machine — from a mechanical foot treadle to an electrical foot switch which is attached to a long wire and can be moved over a wide area — reduced the "safety aspect" of

the machine in that it increased the chances of accidentally kicking the switch and activating the press. He was of the opinion that this change was the cause of the accident. But on cross-examination he admitted that without safety devices the press was a hazardous machine and that the accident would not have occurred had the press been equipped with an effective point of operation safety device.

Stewart said that the nature of the safety device used in a particular operation would depend on the nature of the die and the manner of feeding the die. He stated that the push-button device would in some cases interfere with the operation of the machine such as where the operator is required to hold a long piece of metal which is to be cut at one end. On such an occasion at least one of the operator's hands would be holding the piece of metal and thus he could not depress both buttons. On cross-examination, however, he said that the press can be designed so that the push-buttons could be temporarily inactivated.

Defendant's expert further testified that it was customary for the user to install safety devices and that it would be "impractical" for the manufacturer to install them unless the buyer informed him of the type of guard necessary for the operation to which the machine was to be put. However, on cross-examination he said, "There have been innumerable injuries to people using power punch presses because of failing in the installation of point of operation guarding by the user . . . ." He added that this fact was known to the manufacturers of power presses.

The trial court in granting defendant's motion held that the evidence did not support a verdict for the plaintiffs. On the issue of negligence the court stated that where a manufacturer has every reason to believe that the person to whom an instrumentality is supplied will do whatever is necessary to make the product reasonably safe before it is put to use, the manufacturer in delivering the product without safety devices does not breach a duty to the ultimate user. The court reasoned that since the evidence here showed

that it was the custom of the trade for the purchaser rather than the manufacturer to install safety devices and since *N. J. S. A.* 34:6–62,* in effect at the time of the sale, and the New Jersey safety code required the press owner to provide safety devices, Havir reasonably expected Arrow to install guards.

The trial court further stated that where it is not feasible for a manufacturer to install safety devices he has no duty to do so. It said that the evidence showed that power presses like the one here are used for various operations and that no safety device was suitable to all such operations. Thus, it held it was impracticable for Havir to install safety devices on the press in question.

The court also noted that the change in the activating mechanism of the machine from a mechanical foot treadle to an electrical pedal put in doubt whether the absence of a safety device was the proximate cause of Finnegan's injuries. But it rested its conclusion on the issue of negligence on the principles of Havir's reasonable expectation and the infeasibility of installation of protective guards by Havir.

On the issue of strict liability the court considered the alteration of the foot pedal conclusive. It applied the rule set forth in the *Restatement,* which reads in pertinent part:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold. *Restatement, Torts 2d* § 402A(1965).

The court held that the change here was "substantial" within the meaning of section (1)(b) of the *Restatement.*

---

*Since the sale of the press *N. J. S. A.* 34:6–62 has been repealed and superseded by *N. J. S. A.* 34:6A–3 (*L.* 1965, c. 154, § 20, effective September 6, 1966).

■ The test to be applied in reviewing a judgment notwithstanding the verdict under *R.* 4:40–2 is the same as that applied on a motion for involuntary dismissal. *Dolson v. Anastasia,* 55 *N. J.* 2, 5 (1969) ; *Pressler, Current New Jersey Court Rules,* at Comment *R.* 4:40–2, Comment at 540. If, taking as true all evidence supporting plaintiffs' position and according them the benefit of all inferences which can be reasonably drawn therefrom reasonable minds could differ, the motion should be denied. *Dolson, supra* at 5–6. Applying this test to the case before us, we cannot agree with the trial court's application of the law on either negligence or strict liability principles.

■ The punch press here without safety devices was unquestionably dangerous to the user. We agree with the trial court to the extent that sweep gates or other devices such as a guardrail could not, according to the evidence, feasibly be installed by the manufacturer. Plaintiffs' proofs did not show that any of these devices would be appropriate for most or all of the machine's normal uses. Defendant's expert testified that the particular use to which the machine was to be put and the nature of the die would dictate the type of point of operation guard which should be installed. In view of this testimony we do not think reasonable men could conclude that it was practicable for Havir to equip its presses with all of the above safety devices. However, from the evidence we think the jury could reasonably infer that the two-hand push-button device was suitable for every normal use of the machine. Several facts already referred to support our conclusion and bear repeating. First, it was the opinion of plaintiffs' expert that the push-button device should be installed by the manufacturer as a "minimum" and that it was suitable to every use to which the press could be put. Further, he said installation of such a device by the manufacturer would be simple and not costly. Second, the Walsh catalog states that the two-hand guard is adaptable to *all* power press work. Third, plaintiffs' expert testified that one manufacturer of power presses, Federal,

installs the push-button device before the sale of its machine. Though the expert did not say whether Federal equipped its presses with the device in 1949, that does not detract from the inference that if it is feasible for a manufacturer to install the guard today it was feasible to do so in 1949. Fourth, although defendant's expert stated that the push-button device would be inappropriate when the machine was used to cut holes in a long piece of metal, he admitted that the press could be constructed with a push-button device which could be inactivated on such an occasion.

On the basis of the above evidence the jury could infer that the two-hand push-button device would not bar any of the normal operations of the machine and, thus, that it was not impracticable for Havir to equip its machine with such a device.

On the question of negligence we must consider whether Havir acted reasonably under all the circumstances including whether it was foreseeable by Havir that Arrow would not install a safety device. As to that question, the custom of the trade — that the manufacturer did not install safety devices but relied on the purchaser to do so — while evidential, is not conclusive. *Wellenheider v. Rader*, 49 *N. J.* 1, 7 (1967). Nor is it conclusive that *N. J. S. A.* 34:6–62 and the New Jersey safety code imposed the duty on the purchaser. While Havir may have thought that Arrow would have taken adequate precautions to protect its employees or that it would be required to do so by statute or code, we do not think Havir had a right as a matter of law to assume such devices would be provided. See *Rhoads v. Service Machine Co.*, 329 *F. Supp.* 367, 376 (E. D. Ark. 1971), cited with approval in *Bexiga v. Havir Manufacturing Corp.*, 60 *N. J.* 402, at 411 (1972) decided today. This is especially true here where defendant's own expert testified that manufacturers of power presses knew of "innumerable" injuries to press operators resulting from purchasers' failure to install safety devices. We hold that the jury could

properly find Havir negligent in not installing safety devices under the circumstances of the present case.

To be held under strict liability the *Restatement,* § 402A, not only requires that the machine be in an unreasonably dangerous condition but also that the manufacturer expect it to reach the user without substantial change. (1)(b). However, in cases such as the present one, on the issue of strict liability a manufacturer's expectation that a safety device will be provided by the purchaser is not relevant. See *Bexiga, supra.* To the extent that the *Restatement* requires such a consideration it is inapplicable. *Id.* As we held today in *Bexiga*:

> "Where a manufacturer places into the channels of trade a finished product which can be put to use and which should be provided with safety devices because without such it creates an unreasonable risk of harm, and where such safety devices can feasibly be installed by the manufacturer, the fact that he expects that someone else will install such devices should not immunize him. The public interest in assuring that safety devices are installed demands more from the manufacturer than to permit him to leave such a critical phase of his manufacturing process to the haphazard conduct of the ultimate purchaser. The only way to be certain that such devices will be installed on all machines — which clearly the public interest requires — is to place the duty on the manufacturer where it is feasible for him to do so." *Id.* at 410.

We also think it was for the jury to determine whether the substitution of the electrical pedal for the mechanical foot treadle was such a "substantial change" within the meaning of the *Restatement* as would relieve Havir of liability. In addition, it was for the jury to decide whether the alteration was an intervening factor sufficient to absolve Havir. Although defendant's expert testified that the substituted pedal increased the likelihood of accidentally activating the press and that that change was the cause of the accident, he conceded that had the machine been equipped with an effective point of operation safety device the accident would not have occurred. The jury could infer that because of the lack of a safety device the accident would

have occurred notwithstanding the change to an electrical foot pedal. Thus, it could conclude that the substitution had little or nothing to do with the happening of the accident. At the most the alteration bears on the issue of proximate cause and was a matter for the jury.

In the present case the jury could properly find that the installation by Havir of a push-button device was practicable and therefore that the machine was defectively designed. It could also properly find that the lack of a safety device was a proximate cause of Finnegan's injury. In addition, the jury could find that the defendant was negligent in failing to provide a suitable warning on the machine to the operator of using the press without an adequate safety device. See *Bexiga, supra,* at 402. Further, we hold that under the circumstances of this case the defense of contributory negligence was unavailable. *Id.* at 402.

In the circumstances we do not believe it would be in the interests of justice to remand this case to the trial court for a determination of defendant's alternative motion that the jury's verdict was against the weight of the evidence. Evaluating the evidence in the exercise of our original jurisdiction, we think the verdict of the jury was fully justified. Therefore, the judgment n.o.v. of the trial court is reversed and the verdict of the jury is reinstated.

*For reversal*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and MOUNTAIN—7.

*For affirmance*—None.