FRED BROWN, PLAINTIFF-RESPONDENT, v. UNITED STATES STOVE COMPANY, DEFENDANT-APPELLANT.

Argued October 24, 1983—Decided December 21, 1984.

156

158

*George J. Kenny* argued the cause for appellant (*Connell, Foley & Geiser,* attorneys).

*Robert E. Margulies* argued the cause for respondent (*Margulies, Margulies & Wind,* attorneys; *Seymour Margulies,* of

counsel; *Robert E. Margulies* and *Seymour Margulies*, on the briefs).

The opinion of the Court was delivered by

HANDLER, J.

This is a strict products liability case that raises the issue of whether a manufacturer can be held liable for a design defect of its product when, after leaving the control of the manufacturer, that product was rendered more dangerous by its substantial alteration or misuse by a subsequent purchaser. The principles of law that generally govern the resolution of this question were considered in *Soler v. Castmaster, Division of H.P.M. Corp.*, 97 *N.J.* 137 (1984), decided today. This appeal calls for further consideration of whether the product as originally designed was defective in failing to prevent or avoid a subsequent substantial alteration or misuse that was foreseeable, and whether such a design defect constitutes a proximate cause of the accident, taking into account the subsequent alteration or misuse.

Plaintiff, Fred Brown, sued defendant, United States Stove Company, for accidental injuries consisting of extensive burns suffered from a fire caused by the use of a heater, designed and manufactured by defendant. Plaintiff asserted causes of action in strict liability and negligence. Other defendants named originally are no longer in the case. The case was tried before a jury. After hearing all the evidence, the trial court dismissed plaintiff's claim as a matter of law, pursuant to Rule 4:40–1. The court ruled that defendant should not be held to any legal duty with respect to strict liability principles, emphasizing particularly that after the heater left defendant's control there was "an absolute and total transformation of a good, safe product into a completely unsafe product," the subsequent alteration of which was not reasonably foreseeable. The Appellate Division reversed the trial court and remanded the matter, ruling that there were unresolved factual disputes and, there-

fore, jury questions relating to the reasonable foreseeability of the alteration of the product. We granted certification, 93 *N.J.* 256 (1983).

## I

Plaintiff suffered burn injuries while he was standing near a free-standing, unvented space heater being used to heat a garage at a salvage yard. The heater had been manufactured by defendant. As originally designed, the heater was equipped with a pilot light tube, thermocouple valve, and gas safety shut-off valve. These devices monitored the pressure of gas in the heater; if the pressure was too high, the devices would automatically stop the inflow of gas and shut off the heater. The heater had been substantially altered by plaintiff's employer approximately fifteen years before the accident occurred. The pilot light tube, thermocouple valve and gas safety shut-off valve had been removed, so that at the time of the accident, the flow of gas in the heater was unregulated and was set at a pressure approximately 100 times greater than that for which the heater was designed. The accident occurred when excess propane gas ignited, resulting in a sudden flare-up that set plaintiff's clothes afire.

The trial court ruled that defendant should not be liable under the strict products liability doctrine. The court determined that the alterations to the heater were not reasonably foreseeable. The court reasoned that in considering the foreseeability of an intervening act, "one must ask * * * whether it was highly extraordinary or extraordinarily negligent * * *." The trial court then determined that removal of all the safety devices "was at very least extraordinarily negligent," and thus not foreseeable by defendant. The Appellate Division disagreed, holding that issues decided by the court should have been submitted to the jury.

The critical evidence in the case related to the design of the heater and the foreseeability of its alteration or misuse. Mr.

Bigelow, an expert witness for plaintiff, testified that "it [was] reasonably probable to assume that a percentage of stoves [*i.e.,* heaters] of that type manufactured at any time will be substantially altered." He also testified that it was reasonable to assume that heaters of that type manufactured in that time frame would be misused and abused since they were often used as temporary heaters on construction sites.[1] He stated that they "received the worst care—treatment of appliances that [he had] ever seen," and that "it was common knowledge within the gas industry that appliances of this type were badly misused and abused in that * * * type of service." He testified that a manufacturer could have reasonably anticipated that by one means or another the safety devices would be defeated and an appliance operated at a higher pressure than that intended by its design.

The expert further stated that although the heater was a completely safe product if operated as designed, it was defective in that its design rendered it susceptible to the reasonably foreseeable alterations that were made. He pointed out that the safety mechanism was connected to the heater with a commercially available right-handed threading that could easily be disengaged by a person without expertise in pipe fitting. In his view, possible alternative devices consisted of noncommercial left-handed threading and inverted flange connectors, which were available during the 1950's and 1960's and would have made alteration of the heater much more difficult, without impairing the usefulness of the heater. Bigelow also stated that other safeties had different outlet threading from that used with this heater, although he had not seen other types of connectors on the particular kind of safety device used in this type of heater. Most of his testimony focused on the left-hand-

---

[1]Testimony reveals that although the heater here had been used on construction sites, at the time of plaintiff's accident it had been moved inside a garage in a salvage yard.

ed threading, which, he stated, would have been only slightly more costly ("a few pennies") than the right-handed threading.[2]

In contrast, Mr. Fox, an employee of defendant, testified that he had reviewed defendant's files that related to the safety of the unvented space heaters, examining complaints and reports dating as far back as the 1950's. He concluded that none of the files contained any information relating to modifications such as the ones performed on the heater involved in this case. Fox also stated that the heater was not designed or manufactured to be used on construction sites and that a different category of heaters was designed for that purpose. This particular model was intended to be used for heating one or two rooms in a house.

Fox's testimony for defendant also addressed the use of the heater and the effect of different safety devices in connection with its use. He testified that the right-handed threading was used for two reasons, serviceability and market convenience. Defendant used the right-handed or common threading because it was a standard component that could be serviced or replaced economically and efficiently. According to Fox, repairers would not stock noncommercially threaded devices, and, without standard components, consumers would lose the benefit of having a relatively inexpensive, serviceable product.

Fox also explained that defendant bought the safety devices from a large manufacturer and was "basically confined to utilizing the safety valve equipment that [was] on the commercial market." With respect to plaintiff's suggested alternative, Fox testified that left-handed threading safety devices were not

---

[2]The Appellate Division noted that defendant argued in its brief and orally before that court that a rubber hose slipped over the heater piping to introduce gas was the method of connection at the time of the accident injuring plaintiff, making the issue of threading irrelevant. In order to avoid unresolved factual disputes regarding this issue, defendant has conceded for the purpose of appellate review in this Court that at the time of the accident a threaded connection was used to introduce gas from the propane cylinder.

available, that an inverted flange fitting was normally used with copper tubing, not solid pipe as was used in this product, and that it "would not be practical on the outlet connection of this heater." To his knowledge, no equivalent manufacturer used an inverted flange. With regard to the cost of left-handed threading, Fox did not accept plaintiff's assertion that it was available and hence could not comment on its manufacturing costs. However, he emphasized that the cost of replacement to consumers would be very high because the non-standard components would have to be ordered from the factory, increasing the expense and delay of repair.

## II

As we observed in *Soler, supra,* a manufacturer has a duty to make sure that its manufactured products placed into the stream of commerce are suitably safe when properly used for their intended or reasonably foreseeable purposes. 98 *N.J.* at 144–145; *Suter v. San Angelo Foundry & Mach. Co.,* 81 *N.J.* 150, 169 (1979). *See Green v. Sterling Extruder Corp.,* 95 *N.J.* 263, 264 (1984). If a product is not suitably safe when so used because of a defect inherent in its design, the manufacturer will be strictly liable in tort for ensuing injuries to foreseeable users. *Cepeda v. Cumberland Eng'g. Co., Inc.,* 76 *N.J.* 152, 177 (1978).

The primary standard for determining whether a manufactured product has been designed defectively involves the risk-utility formula. *Soler, supra,* 98 *N.J.* at 145; *O'Brien v. Muskin,* 94 *N.J.* 169, 181 (1983). If its risks outweigh its utility, the product is defective. *O'Brien, supra,* 94 *N.J.* at 186. The initial inquiry in this appeal therefore must focus upon the evidence relating to whether the heater as originally designed was defective under the risk-utility standard. *Suter, supra,* 81 *N.J.* at 171–72.

While strict products liability attaches when the product, shown to be defective, has been used for its intended purposes

as originally designed, *Restatement (Second) of Torts* § 402A, we further recognized in *Soler, supra,* that a manufacturer can also be held liable under strict liability principles for design defects if it is objectively foreseeable that a substantial change in the product will cause injury. 98 *N.J.* at 151–152. This ruling was clearly foreshadowed in several recent decisions. *E.g., Michalko v. Cooke Color & Chem. Corp.,* 91 *N.J.* 386 (1982); *Suter, supra,* 81 *N.J.* at 168–69; *Cepeda, supra,* 76 *N.J.* at 152. It has also been recognized elsewhere. *E.g., Whitehead v. St. Joe Lead Co., Inc.,* 729 *F.*2d 238, 250 (3d Cir.1984); *Saupitty v. Yazoo Mfg. Co., Inc.,* 726 *F.*2d 657, 659 (10th Cir.1984); *Merriweather v. E.W. Bliss Co.,* 636 *F.*2d 42, 45, 46 (3d Cir.1980); *Thompson v. Package Mach. Co.,* 22 *Cal.App.*3d 188, 196, 99 *Cal.Rptr.* 281, 286 (Cal.Ct.App.1972); *Duke v. Gulf &. Western Mfg. Co.,* 660 *S.W.*2d 404, 414 (Mo.Ct.App.1983); *Sharp v. Chrysler Corp.,* 432 *S.W.*2d 131, 136 (Tex.Civ.App.1968).

■ The critical factor in determining whether a subsequent substantial alteration of a product or its misuse can be attributed to a manufacturer as a proximate result of an original design defect under the risk-utility standard is "foreseeability." *Soler, supra,* 98 *N.J.* at 151–152. This was highlighted in *Cepeda.*

> [W]hile foreseeability by the defendant of the harmful character (dangerous proclivity) of the product is not a requisite to liability, foreseeability (objective) of the kind of use (or misuse) of the product which occurred is a relevant factor. [76 *N.J.* at 175 (citations omitted).]

■ We further stressed in *Cepeda,* "that in applying strict liability in tort for design defects, manufacturers cannot escape liability on grounds of misuse or abnormal use if the actual use proximate to the injury was *objectively foreseeable.*" 76 *N.J.* at 177 (citations omitted; emphasis added). *See Suter, supra,* 81 *N.J.* at 159 ("an *unforeseeable* misuse of a product may not give rise to strict liability"). "Foreseeability" in the context of determining a design defect under the risk-utility standard has been defined as " 'reasonable foreseeability,' (*i.e.,* objective, it need not be actual. Noel, ["Defective Products: Abnormal Use, Contributory Negligence and Assumption of Risk,"] 25

*Vand.L.Rev.* [93,] 100 [ (1972) ].)," *Cepeda, supra,* 76 *N.J.* at 178. The dangers inherent in the product arising out of its subsequent misuse or substantial alteration are not objectively foreseeable by a manufacturer when a product is misused or substantially changed in a manner that could not have been reasonably anticipated by a manufacturer at the time the product was designed and manufactured. *See Daniell v. Ford Motor Co., Inc.,* 581 *F.Supp.* 728, 730 (D.N.M.1984); Walkowiak, "Uniform Products Liability Act," 1 *S.M.U. Products Liability Inst.,* § 8.02 at 8–7 (1980).

We note contrary authority that absolves a manufacturer from liability for accidental injuries attributed to a substantial alteration if the alteration involves a safety feature of the product without regard to the foreseeability of the alteration. *E.g., Robinson v. Reed-Prentice Division of Package Machine Co.,* 49 *N.Y.*2d 471, 426 *N.Y.S.*2d 717, 403 *N.E.*2d 440 (1980). This decisional law, however, fails to appreciate that it is only the safety aspect of a product that is implicated in the notion of a manufacturer's responsibility for subsequent alterations. While a subsequent change in a product may be material or significant, such a change is not "substantial" for strict liability purposes unless it is related to or affects the safety of the product and its potential for danger. *Soler, supra,* 98 *N.J.* at 148. Consequently a design defect inherent in a safety feature of a product that foreseeably leads to a substantial alteration and an increased risk of danger can be a basis for strict products liability. *See Robinson, supra,* 49 *N.Y.*2d at 482, 426 *N.Y.S.*2d at 722, 403 *N.E.*2d at 446 (Fuchsburg, J., dissenting).

Moreover, virtually all of these contrary decisions disregard or deemphasize the element of "foreseeability," which may extend a manufacturer's liability for subsequent substantial alterations. The approach of these cases is flatly inconsistent with our express holding in *Soler,* as well as the principles clearly approved in *Michalko, Suter* and *Cepeda.* Moreover, these cases run counter to the identical principles applicable

generally in the tort field, which in particular situations posit responsibility for the negligent failure reasonably to foresee the intentional, wilful or even criminal acts of third persons that proximately cause injuries. *See, e.g., Butler v. Acme Markets,* 89 *N.J.* 270 (1982); *Hill v. Yaskin,* 75 *N.J.* 139 (1977); *Trentacost v. Brussel,* 82 *N.J.* 214 (1980); *Braitman v. Overlook Terrace,* 68 *N.J.* 368 (1975).

Further, the principle of "objective foreseeability" comports with a basic theme of strict products liability, namely, that the *condition* of the product, rather than the *conduct* of the manufacturer is determinative of ultimate responsibility for product failure causing accidental injuries. *Suter,* 81 *N.J.* at 181 (Clifford, J., dissenting.) For that reason, "objective foreseeability" does not affix responsibility for future events that are only theoretically, remotely, or just possibly foreseeable, or even simply subjectively foreseen by a particular manufacturer. Rather, the doctrine applies to those future occurrences that, in light of the general experience within the industry when the product was manufactured, objectively and reasonably could have been anticipated. *Supra* at 167.

We see no merit in the additional, particularized argument that in this case the heater was not simply substantially altered by the plaintiff's employer, but also it was abused or misused by its owner, plaintiff's employer, in that it was used to generate heat well beyond its original designed capacity. With respect to whether there is an original design defect, the misuse or improper use of the product, if objectively foreseeable, does not pose a legal issue that is materially different from that involving the foreseeable subsequent alteration of the product absent any misuse. We pointed this out in *Soler:*

Foreseeable misuse or abnormal use can be extended by analogy to foreseeable substantial change of the product from its original design. * * * [I]n the event of either a substantial alteration or misuse, the manufacturer will be responsible for resultant injuries to an operator if the alteration or misuse implicated in the actual use of the machine as a proximate cause of the injury

was foreseeable and could have been prevented or reduced by the manufacturer. [98 *N.J.* at 151.]

The concept of a defect-free and properly-designed product extends to one that is suitably safe after it has been either foreseeably altered or foreseeably misused. As we anticipated in *Soler*, drawing upon *Cepeda* (76 *N.J.* at 177) and *Suter* (81 *N.J.* at 159), the foreseeable misuse of a product that proximately causes injury is analogous to a foreseeable subsequent alteration of the product, and generates the same legal consequences in terms of strict products liability. 98 *N.J.* at 151–152.

If a factual issue exists, a determination of objective foreseeability that substantial change or misuse will occur is a jury question. *Soler, supra; see Cepeda, supra,* 76 *N.J.* at 180; *Merriweather v. E.W. Bliss Co., supra,* 636 *F.*2d at 45. It is plaintiff's burden to demonstrate that it was objectively foreseeable that the subsequent substantial alteration or misuse of the product would create the risk of his injury. *Beatty v. Schramm, Inc.,* 188 *N.J.Super.* 587, 591 (App.Div.1983).

Although the evidence in this case was disputed, plaintiff did offer testimony to indicate that the change and misuse of the heater were foreseeable. Plaintiff's expert testified that it was commonplace to alter these heaters so they could generate more heat than that for which they were originally designed. The evidence, if credited, tended to show that such subsequent changes or abuses of the heater were *objectively* foreseeable—it was "common knowledge" and the practice was widespread. Defendant's evidence consisted of its review of its own records to determine whether there were reports of any incidents of alterations, misuse, or abuse of its heaters. This evidence tended to show that defendant itself had no *actual* knowledge of such matters. This, however, simply tends to establish the absence of *subjective* foreseeability. The evidence does not, as a matter of law, rebut the evidence of objective foreseeability introduced by plaintiff. Hence, there was sufficient evidence to demonstrate objective foreseeability of these

future occurrences, namely, the removal of the heater's safety control mechanisms and the misuse of the product.

This, however, does not end the inquiry as to whether the product was not suitably safe because of a design defect. As noted earlier, the proper test for determining whether the product as designed was defective is the risk-utility standard. With respect to the utility element of that equation, it is urged by defendant that it was not feasible to modify the original design of the product to reduce the unsafe character of the product because this could not be done without impairing its usefulness or excessively increasing its cost.

In this case, the trial court properly acknowledged defendant's evidence that its heater as manufactured was a desirable and useful product; it was a relatively inexpensive and effective consumer article. Defendant also provided testimony that its product was successful because it was geared for efficient and inexpensive consumer use and that the technology suggested by plaintiff would destroy the product's utility. While plaintiff did not directly rebut any of defendant's evidence tending to show the inutility of alternative safety devices, the inferences to be drawn from all of the evidence and the ultimate conclusion to be reached concerning relative or comparative feasibility are disputable. *See O'Brien, supra,* 94 *N.J.* at 184–85. Although this element of the risk-utility equation seems strongly to favor defendant, it does not dictate that plaintiff's cause of action must fail on this ground. "If * * * there is a fact question whether the risks outweigh the utility of the product, then the matter is for the trier of fact." *O'Brien, supra,* 94 *N.J.* at 186. The issue becomes a matter of law only when the minds of reasonable people "could not differ on whether the risks posed by a product outweigh its utility, or vice versa * * *." *Id.*

In sum, the issue as to whether the product manufactured by defendant was defective in design, taking into account all of the factors relevant under the risk-utility analysis fairly presented

a question to be determined by a jury. The trial court's ruling to the contrary on this point was in error.

### III

There is yet another issue to be addressed—whether the evidence was sufficient to enable a jury to determine that the design defect of the manufactured product was a proximate cause of the ensuing injury to plaintiff. Proximate cause includes the notion of concurrent cause when more than one act contributes to the accidental harm. As we said in *Michalko, supra,* 91 *N.J.* at 400, and reiterated in *Soler, supra,* 98 *N.J.* at 149,

[e]ven a significant subsequent alteration of a manufactured product will not relieve the manufacturer of liability unless the change itself creates the defect that constitutes the proximate cause of the injury. *States Steamship [Co. v. Stone Manganese Marine Ltd.],* 371 *F.Supp.* [500] at 505 [(D.N.J.1973)]. Thus, if the defect which, singly or in combination, caused the injury existed before, as well as after, the change, the manufacturer is not relieved of liability, regardless of how much the product has been changed. *Id.; Ortiz v. Farrell Co.,* 171 *N.J.Super.* 109 (Law Div.1979).

In a case such as this, as in *Soler,* if the original defect, although not the sole cause of the accident, constituted a contributing or concurrent proximate cause in conjunction with the subsequent alteration, the defendant manufacturer will remain liable. 98 *N.J.* at 149; *see Johnson v. Salem Corp.,* 97 *N.J.* 78, 94–95 (1984); *see also Southwire Co. v. Beloit Eastern Corp.,* 370 *F.Supp.* 842, 857 n. 21 (E.D.Pa.1974) (for substantial change to negate [*Restatement*] § 402A liability, it must be intervening superseding cause or perhaps even sole proximate cause of injury together with defective and unreasonably dangerous product).

With respect to concurrent proximate causation, a tortfeasor will be held answerable if its "negligent conduct was a substantial factor in bringing about the injuries," even where there are "other intervening causes which were foreseeable or were normal incidents of the risk created." *Rappaport v. Nichols,* 31 *N.J.* 188 (1959); *see Menth v. Breeze Corp.,* 4 *N.J.* 428

(1950); *Daniel v. Gielty Trucking Co.*, 116 *N.J.L.* 172 (E. & A.1935). We have recognized these principles of concurrent causation in the strict products liability context to determine whether an original design defect can be considered a concurrent proximate cause of an accidental injury where there have been subsequent alterations of the product or other intervening causes. *See Freund v. Cellofilm Properties, Inc.*, 87 *N.J.* 229 (1981). Our application of the doctrine of concurrent causation in strict products liability cases has been consistent. *E.g., Soler, supra; Johnson, supra; O'Brien, supra; Michalko, supra.*

■ The critical inquiry in a strict products liability case involving multiple causes is whether the manufacturing shortcoming, be it in design or fabrication, endured and remained operative during the course of another's subsequent misconduct. If such a shortcoming continued to remain effective and, further, was found to be a substantial factor in producing the accident, *see, e.g., Michalko, supra; Freund, supra,* it would constitute a "legal" cause, satisfying the requirement of proximate cause.

■ A negligent act is not necessarily a substantial factor or proximate cause of an accident simply because it contributed to the occurrence in the sense that absent such an act the accident would not have transpired. *Latta v. Caulfield,* 79 *N.J.* 128 (1979). Rather, the critical consideration, in the context of multiple factors contributing to the cause of the accident, is whether the faulty act was itself too remotely or insignificantly related to the accident. If it can fairly be regarded as sufficiently remote or insignificant in relation to the eventual accident then, in a legal sense, such fault does not constitute "a cause of the accident, * * * [but] 'simply presents the condition under which the injury was received,' * * *." *Id.* at 133 (quoting *Pangborn v. Central Railroad Co.*, 18 *N.J.* 84, 102 (Sup.Ct.1893)).

 We have recognized that the existence of a duty that will affix responsibility for resultant injury ultimately involves notions of public policy. *See Berko v. Freda,* 93 *N.J.* 81 (1983); *Goldberg v. Housing Auth. of Newark,* 38 *N.J.* 578, 583 (1962). The assessment as to whether conduct can be considered sufficiently causally connected to accidental harm so as to justify the imposition of liability also implicates concerns for overall fairness and sound public policy. As Justice Hall wrote in *Caputzal v. The Lindsay Co.,* 48 *N.J.* 69 (1966):

> Utilization of [the] term [proximate cause] to draw judicial lines beyond which liability will not be extended is fundamentally * * * an instrument of fairness and policy, although the conclusion is frequently expressed in the confusing language of causation, "foreseeability" and "natural and probable consequences." Many years ago a case in this State hit it on the head when it was said that the determination of proximate cause by a court is to be based " 'upon mixed considerations of logic, common sense, justice, policy and precedent.' " *Powers v. Standard Oil Co.,* 98 *N.J.L.* 730, 734 (Sup.Ct.1923), affirmed o.b. 98 *N.J.L.* 893 (E. & A.1923). [*Id.* at 77–78]

He further quoted insights expressed by Dean Prosser:

> "As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability. Some boundary must be set to liability for the consequences of any act, upon the basis of some social idea of justice or policy.
>
> This limitation is sometimes, although rather infrequently, one of the fact of causation. More often it is purely one of policy, of more or less inadequately expressed ideas of what justice demands, or of administrative possibility and convenience, none of which have any connection with questions of causation at all.") (*Prosser, supra,* pp. 240–41). [*Id.*]

 Principles of public policy, the foundation that undergirds legal responsibility, are appropriate considerations in the strict liability context. *Soler, supra,* 98 *N.J.* at 153–154; *Michalko v. Cooke Color-Chem. Corp., supra,* 91 *N.J.* at 398. These principles are especially germane when the asserted misconduct of persons other than the manufacturer bears upon the imposition of ultimate responsibility for eventual accidental harm. Public policy and fairness concerns consequently must influence a court's analysis of the relevant evidence bearing upon causation.

In this case, the asserted defect was that the safety device was too easily removeable. In terms of its causal relationship to the accident, however, the only evidence produced by plaintiff was that its proposed alternative design would probably have made it "more difficult" to have altered the original safety feature. No evidence was proffered to indicate that with a proper design the removal of the heater's safety features probably could not have been accomplished or even rendered so substantially difficult as to be unlikely. Rather, the record discloses that the heater was deliberately altered for the specific purpose of operating it beyond its safe capacity and, further, it was wilfully, persistently and intensively misused in this fashion for an extraordinarily long period of time, perhaps for as long as fifteen years. In the face of this chronic misconduct, the inference to be drawn is that even were the original design modified in accordance with the plaintiff's proposal, it would not realistically or likely have deterred or obstructed these subsequent abusers of the product or have prevented the kind of injury that resulted from the misuse.

We are satisfied that on the issue of concurrent proximate causation reasonable minds could not differ in terms of the conclusion to be reached on these facts. *Johnson, supra,* 97 *N.J.* at 92–93; *O'Brien, supra,* 94 *N.J.* at 186. Indulging the evidence proffered in support of plaintiff's contentions, it does not overcome the powerful, if not ineluctable, inference that the subsequent course of misconduct was the independent cause of the accident. Any shortcoming by the manufacturer in terms of a design defect was only remotely connected with the eventual accident.

We conclude that the asserted manufacturing design defect in this case was not a substantial factor in contributing to the accident and hence not a "legal" or proximate cause thereof. It would not square with basic notions of sound public policy and overall fairness to conclude that a manufacturer should, under these circumstances, be held legally responsible for the acciden-

tal harm that resulted from the misconduct of others in the misuse of its product.

## IV

In conclusion, while some issues relevant to strict products liability in this case were not seriously controverted, the evidence presented jury questions on certain critical matters, namely those involving the existence of an original design defect. The evidence, however, did not fairly present a jury question with respect to the issue of proximate cause.

Accordingly, for the reasons stated, we reverse the judgment of the Appellate Division.

SCHREIBER, J., concurring.

In my opinion defendant, United States Stove Company, owed no duty to plaintiff and, even if it did, the asserted breach of that duty was not proven to be a cause-in-fact of the breach. The majority, however, asserts that defendant owed a duty to plaintiff. It then proceeds to intertwine concepts of duty with causation-in-fact and concludes that there was no jury issue with respect to the issue of proximate cause. The result is correct, but I am compelled to write because of our differences on the notions of duty and cause-in-fact.

These differences can perhaps be best understood by analyzing the functions that a trial court performs in a negligence suit. First, the trial court must decide whether the injured interest is one that falls within the protection of the rule invoked by the plaintiff. In other words, was the defendant's conduct a hazard against which the rule afforded protection? It is in this sense that a judicial determination must be made whether a duty exists.

Examples of this type of inquiry may be found in *Goldberg v. Housing Auth. of Newark*, 38 *N.J.* 578 (1962), and *Caputzal v. The Lindsay Co.*, 48 *N.J.* 69 (1966). In *Goldberg*, the plaintiff was beaten by two men in a housing project owned by the

defendant. There was evidence that the defendant knew that substantial criminal activity had been occurring on the premises. Chief Justice Weintraub's analysis pointed out that the question of whether a *duty* existed could not be resolved by recourse to "foreseeability." Rather, the question was whether a *duty* existed to take measures to guard against criminal acts. He then continued:

> Whether a *duty* exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and public interest in the proposed solution. [38 *N.J.* at 583.]

*Caputzal* was a strict liability action. Plaintiff sued the manufacturer of a water softener and the company that sold it to him, alleging that it was defective in either its manufacture or installation. The defect caused the water to become discolored and, when the plaintiff discovered that he had drunk the discolored water, he suffered a heart attack. This Court upheld a summary judgment for the defendants, though all the facts stated in the complaint, including causation-in-fact, were assumed to be true. Justice Hall, writing for a unanimous Court, stated:

> Foreseeability is not solely a mere matter of logic, since *anything is foreseeable*, but frequently involves questions of policy as well. When it does, the matter is one for determination by the court and not by the factfinder.
>
> \* \* \* \* \* \* \* \*
>
> In the instant case it is much too fanciful to say, from the point of view of *fairness*, that a reasonable manufacturer, seller or installer of water softeners should be held to recognize that he would create an unreasonable risk of any substantial physical injury whatever to anyone by the defect here involved, let alone a heart attack. [48 *N.J.* at 75–76 (emphasis added).]

### Justice Hall further observed:

> Recovery for the type of result here involved is denied in many cases also on the ground of lack of proximate cause, which we should briefly mention. Utilization of that term to draw judicial lines beyond which liability will not be extended is fundamentally as an instrument of fairness and policy, although the conclusion is frequently expressed in the confusing language of causation, "foreseeability" and "natural and probable consequences." Many years ago a case in this State hit it on the head when it was said that the determination of proximate cause by a court is to be based " 'upon mixed considerations of logic, common sense, justice, policy and precedent.' " *Powers v. Standard Oil Co.,*

98 *N.J.L.* 730, 734 (Sup.Ct.1923), affirmed o.b. 98 *N.J.L.* 893 (E. & A.1923). Dean Prosser puts it well in this fashion:

> "As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability. Some boundary must be set to liability for the consequences of any act, upon the basis of some social idea of justice or policy.
>
> This limitation is sometimes, although rather infrequently, one of the fact of causation. More often it is purely one of policy, of our more or less inadequately expressed ideas of what justice demands, or of administrative possibility and convenience, none of which have any connection with questions of causation at all." (*Prosser, op. cit. supra*, pp. 240–41). [48 *N.J.* at 77–78.]

The *Caputzal* and *Goldberg* rationales are the same. Both seek in the first instance a determination as to whether a duty exists. *Caputzal* simply adds that some courts have expressed the issue in the confusing language of causation and foreseeability. In both *Goldberg* and *Caputzal*, this Court found that no duty existed.

A sharp line should be drawn between the duty question discussed above and whether or not as a matter of law more than one reasonable conclusion might be drawn from the evidence. The trial court must decide whether the plaintiff has produced sufficient evidence from which the jury upon proper instructions may determine whether there is causal relationship in fact. This issue is always for the jury, except when the facts will support only one reasonable inference. Here plaintiff failed on both counts. He did not prove that defendant breached a duty owed to him. Even if there were a duty, he did not establish cause-in-fact.

## I

Before we consider the question of duty, it is appropriate to bear in mind the salient facts. Defendant, a manufacturer, produced a residential gas space heating unit that was reasonably fit, safe, and suitable for its intended purpose, namely, to provide heat in a room. The manufacturer had incorporated appropriate safety devices in the unit. Plaintiff's employer

removed those safety devices. Approximately fifteen years thereafter plaintiff was burned when gas, which had allegedly accumulated due to the removal of the safety devices, ignited. Plaintiff's expert suggested that use of a left-handed thread nipple instead of a right-handed thread nipple would have made it more difficult to remove the safety devices.

We have generally adopted section 402A of the *Restatement (Second) of Torts.*[1] *Cepeda v. Cumberland Eng'g Co.*, 76 *N.J.* 152, 163, 169 (1978). That section reads as follows:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>> (a) the seller is engaged in the business of selling such a product, and
>> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
> (2) The rule stated in Subsection (1) applies although
>> (a) the seller has exercised all possible care in the preparation and sale of his product, and
>> (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

When the manufacturer produces a product that is reasonably fit, suitable, and safe for its intended purposes and it reaches the user without substantial change, then the general rule, as stated in section 402A, is that the manufacturer is not responsible. When the seller "delivers the product in a safe condition, and subsequent mishandling or other causes made it harmful by the time it is consumed," the seller is not responsible. *Restatement* § 402A comment g. The *Restatement*, however, notes a possible exception to this rule when the seller expects the product to be processed or otherwise substantially changed before it reaches the user or consumer. *Id.* caveat (2),

---

[1]We have substituted the phrase "reasonably fit, suitable and safe" for "unreasonably dangerous." *Suter v. San Angelo Foundry & Mach. Co.*, 81 *N.J.* 150, 176 (1979). We have differed with subsection (1)(b) of the Restatement in that the manufacturer remains liable even though he contemplates that the purchaser will add needed safety devices to the product. *See Finnegan v. Havir Mfg. Corp.*, 60 *N.J.* 413, 423–24 (1972); *Bexiga v. Havir Mfg. Corp.*, 60 *N.J.* 402, 410 (1972).

comment p. This exception may occur when the manufacturer should have anticipated changes in the normal course of usage of the product. See *id.* comment p (and examples therein). When safety devices are removed from a product, however, it is appropriate to ask whether responsibility should be imposed on the intermediate party who made the change or on the manufacturer.

The focus of the inquiry should be whether the ultimate result is fair and equitable. *See Caputzal v. The Lindsay Co.,* *supra,* 48 *N.J.* at 77; *Goldberg v. Housing Auth. of Newark,* *supra,* 38 *N.J.* at 583. In this case and under these circumstances should the particular hazard fall within the scope of protection afforded by the doctrine of strict liability? The ultimate question is whether the standard proposed by plaintiff to utilize a left-handed thread nipple should be adopted. If so, it would of course affect an entire product line. *See* Twerski, "Seizing the Middle Ground Between Rules and Standards in Design Defect Litigation: Advancing Directed Verdict Practice in the Law of Torts," 57 *N.Y.U.L.Rev.* 521, 545–46 (1982). The public that buys heaters would have to pay more. *Id.* at 544–45. Should those purchasers, who presumably are located in many states, bear the costs of the improper action of plaintiff's employer?

Plaintiff's proposed standard would also have an adverse impact upon servicing and component interchangeability. The uncontradicted evidence is that service people carry standard right-handed threads utilized in appliances made by other manufacturers. Further, the safety valve used by defendant is made by many companies and these valves are interchangeable. Thus, consumers' heaters may now be serviced readily and expeditiously by various appliance dealers. Obtaining a special part from the factory would be more costly and time-consuming. Although technologically known, the left-handed thread unit has not been available in the industry. Plaintiff's proposed design change would substantially affect the utility in the field of defendant's safety valve and the product.

What was the likelihood that the space heater would cause injury? Defendant had no records of any complaints concerning removal of the safety devices, though it had sold 50,000 residential space heaters over a twenty-year period. Throughout fifteen years of the misuse of the heater in question, the instant situation was apparently the only one in which injury occurred.

I question the fairness of condemning defendant's design of its space heater product line predicated on this one incident when it appears that the design decision to install the safety devices made the heater reasonably fit, suitable, and safe for its intended purpose as a residential space heater. Defendant has provided an adequate safety device whose only alleged flaw is that it can be removed. Though there may be circumstances in which this is enough to constitute a defect (for example, if the safety device was so easy to remove that a small child could and did remove it), this is not such a situation.

Most cases that relate to the removal of safety devices when such removal is not required for the machine's operation and maintenance have held that the manufacturer is not subject to strict liability. *See Hanlon v. Cyril Bath Co.*, 541 *F.*2d 343, 345–46 (3d Cir.1975) (under Pennsylvania law, manufacturer entitled to a directed verdict because of "a substantial change," as used in section 402A, when purchaser substituted a "significantly different and much more sensitive starting mechanism" for the original mechanism that protected against accidental activation); *McGrath v. Wallace Murray Corp.*, 496 *F.*2d 299, 302–03 (10th Cir.1974) (under Utah law, misuse was a valid defense when purchaser's employees chose to remove a guard on a grinder because the guard made their work "more difficult"); *Tuttle v. U.S. Slicing Mach. Co.*, 335 *F.*2d 63 (4th Cir.1964) (meat grinder sold with protective grill held in place with screws "not an inherently dangerous instrumentality"); *Ellison v. Northwest Eng'g Co.*, 533 *F.Supp.* 482 (S.D.Fla.1982) (summary judgment granted to manufacturer when affidavits established that guard was bolted in place at time machine was

manufactured and delivered to purchaser, although the guard may subsequently have been removed); *Baines v. U.S. Pipe & Foundry Co.*, 463 *F.Supp.* 107 (N.D.Ala.1979) (summary judgment granted to manufacturer both because product was not defective and no proximate cause existed since purchaser failed to assemble work deck with safety chains that were supplied); *DeArmond v. Hoover Ball & Bearing Uniloy Div.*, 86 *Ill.App.* 3d 1066, 42 *Ill.Dec.* 193, 408 *N.E.*2d 771 (1980) (affirming summary judgment for manufacturer when safety doors were removed by purchaser, regardless of how easy it was to remove the doors); *Coleman v. Verson Allsteel Press Co.*, 64 *Ill.App.* 3d 974, 21 *Ill.Dec.* 742, 382 *N.E.*2d 36 (1978) (affirming judgment for manufacturer because of substantial change when purchaser substituted easily-activated pedestal-mounted control panel for more difficult to activate shoulder-high controls); *Robinson v. Reed-Prentice Div. of Package Mach. Co.*, 49 *N.Y.* 2d 471, 477, 479, 403 *N.E.*2d 440, 442–44, 426 *N.Y.S.*2d 717, 719–22 (1980) (no liability of manufacturer when safety gate and interlocks were so altered by purchaser as to be ineffective even though "manufacturer knew precisely" that the purchaser would so modify the machine); *Temple v. Wean United, Inc.*, 50 *Ohio St.*2d 317, 364 *N.E.*2d 267 (1977) (manufacturer not liable because no defect existed at manufacture and purchaser altered an existing safety precaution by shifting activating buttons from shoulder to waist height); *Ford Motor Co. v. Eads*, 224 *Tenn.* 473, 480–82, 457 *S.W.*2d 28, 31–32 (1970) (no liability for manufacturer because "hot wiring" of tractor was an efficient intervening cause when the hot-wiring circumvented the safety mechanism designed to prevent tractor from being started in gear); *cf. DeRosa v. Remington Arms Co.*, 509 *F.Supp.* 762, 769 (E.D.N.Y.1981) (citing *Robinson, supra,* for the proposition that "deliberate bypassing of safety devices [on a shotgun] for no reason associated with the user's need to utilize the product effectively need not be guarded against" by the manufacturer). *See generally* Note, "Product Modification: The Effect of Foreseeability," 42 *U.Pitt.L.Rev.* 431, 455 (1981)

(to allow liability for foreseeable changes "effectively requires a foolproof design and makes the manufacturer an insurer").

Our New Jersey case law is not to the contrary. While *Cepeda v. Cumberland Eng'g Co., supra,* 76 *N.J.* 152, involved removal of a safety device by someone other than the manufacturer, there the design defect was that the intended operation of the "pelletizing" machine required removal of the safety device. The Court in *Cepeda* found that

> there was credible evidence that the guard had to be removed frequently during operations. Human nature being what it is, we believe a jury might have inferred that a reasonable manufacturer, from that fact, could have objectively expected that on occasion production with the machine would be resumed without replacing a guard just removed in a clean-out operation. [*Id.* at 180–81.]

The removal of the safety device from the gas heater in the instant case was not required in order to operate the gas heater for the purpose for which it was sold: heating rooms by a permanent installation. The holding of *Cepeda* is in line with earlier New Jersey case law that restricted the reach of strict liability to normal uses of a product and ordinary results of such uses. *See Caputzal v. The Lindsay Co., supra,* 48 *N.J.* at 76 (defendant not liable for plaintiff's heart attack caused by fear because such a heart attack was an "extraordinary occurrence, not reasonably to be expected in a normal person"); *Maiorino v. Weco Prods. Co.,* 45 *N.J.* 570, 574 (1965) ("A manufacturer or seller is entitled to expect a normal use of his product. The reach of the doctrine of strict liability in tort in favor of the consumer should not be extended so as to negate that expectation.").

In *Suter v. San Angelo Foundry & Mach. Co.,* 81 *N.J.* 150, 159–60 (1979), we acknowledged that misuse of a product—that is, usage for other than an intended or reasonably anticipated purpose—would not give rise to strict liability. We referred approvingly to nonliability in situations in which a person used a knife as a toothpick and a person contrary to directions walked on a leg supported by a pin that failed because of its misuse. *Id.* at 159–60.

The majority today has effectively reversed the position expressed in *Suter*. To state, as the majority does, that simply because an act is "foreseeable," there is an automatic triggering of a jury question on whether the manufacturer should have guarded against misuse begs the question. Almost any human action is foreseeable. Under the majority's rationale it is "objectively foreseeable" that someone might use a knife as a toothpick or a pin supporting a leg contrary to explicit instructions and that such misuses may therefore become jury questions.

The majority adds that the foreseeability must be "objective" or "reasonable." *Ante* at 165–171. This seeming restriction, however, amounts to little in practical effect. In discussing foreseeability in the context of negligence, Dean Prosser has succinctly stated the problems inherent in reasonable foreseeability: "In one sense, almost nothing is entirely unforeseeable, since there is a very slight mathematical chance, *recognizable in advance*, that even the most freakish accident which is possible will occur, particularly if it has ever happened in history before." *W. Prosser, Law of Torts* § 43 (4th ed. 1971) (emphasis added, footnote omitted).

The removal of a safety device is always objectively foreseeable in the sense that someone, somewhere, is bound to remove it. What product could not have been designed so that a particular injury would have been avoided? Utilizing this open-ended approach is not what strict liability is all about and attempting to limit it by words like foreseeability is nothing more than circular. *See Caputzal v. The Lindsay Co., supra,* 48 *N.J.* at 75 ("anything is foreseeable"); *Goldberg v. Housing Auth. of Newark, supra,* 38 *N.J.* at 583 ("Everyone can foresee the commission of crime virtually anywhere and at any time. If foreseeability itself gave rise to a duty to provide 'police' protection for others, every residential curtilage, every shop, every store, every manufacturing plant would have to be patrolled by the private arms of the owner.").

## II

Causal relation is a factual issue. To recover, plaintiff had the burden of proving that defendant improperly designed the space heater so that it was defective when placed in the stream of commerce and that the defect was a cause-in-fact of the accident and plaintiff's injuries. *See Francis v. United Jersey Bank*, 87 *N.J.* 15, 39 (1981). Plaintiff's theory was that defendant should have used a left-handed thread nipple instead of a right-handed thread nipple in the internal piping, and that if that had been done, the accident would probably not have occurred. Plaintiff, however, produced no evidence from which one could reasonably infer or conclude that plaintiff's employer would not have removed the safety devices had the space heater utilized a left-handed thread or that those in the construction industry generally who were misusing the heaters would not have continued to do so by removing safety devices. Plaintiff simply showed that it would have been somewhat more difficult to remove the controls—not that the removal would probably not have occurred. While proof of certainty is not required, the evidence must generate an inference of probability as distinguished from mere possibility. *Cf. Hansen v. Eagle-Picher Lead Co.*, 8 *N.J.* 133, 141 (1951) (upholding defendant's motion for judgment when proofs failed to establish that defendant's conduct probably caused accident when plaintiff was struck on head by piece of metal that fell from building under construction). It was plaintiff's burden to establish that the alternative design he proposed would have prevented the accident. This he failed to do.

An analogous example has been posed by Professor Twerski. A kitchen blender that broke when a metal spoon was placed in it should have been designed with one-quarter inch shatterproof glass. The injured user seeks recovery from the manufacturer, asserting defective design. Professor Twerski observes that "[i]f the injury would have happened even with the better design, then causation has not been established." Twerski, "The Many Faces of Misuse: An Inquiry Into the Emerging

Doctrine of Comparative Causation," 29 *Mercer L.Rev.* 403, 419–20 (1978).

Plaintiff has not met his burden of proof of causation. Plaintiff at best proved that an alternative design would probably have made it more difficult to remove the safety devices. There was no showing that the increased difficulty would probably have prevented plaintiff's employer from removing the safety devices. Accordingly, plaintiff did not meet his burden of proving that the alleged defect was the cause-in-fact of the accident and his injuries.

I agree with the majority that the judgment of the Appellate Division should be reversed and the trial court's judgment of dismissal reinstated.

Justice CLIFFORD and Justice GARIBALDI join in this opinion.

CLIFFORD, SCHREIBER and GARIBALDI, JJ., concurring in the result.

*For reversal*—Chief Justice WILENTZ and Justice CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.

*For affirmance*—None.