219 N.J. Super. 428 (1987)
530 A.2d 794
ELWOOD MALIN AND EMMA MALIN, HIS WIFE, PLAINTIFFS-APPELLANTS, CROSS-RESPONDENTS,
v.
UNION CARBIDE CORPORATION, CELANESE PLASTICS & SPECIALTY CO., REICHHOLD CHEMICAL CO., AND CIBA-GEIGY, DEFENDANTS-RESPONDENTS, CROSS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 30, 1986.
Decided January 15, 1987.
*429 Before Judges O'BRIEN, SKILLMAN and LANDAU.
*430 Bruce C. Hasbrouck argued the cause for appellants (Hasbrouck & Uliase, attorneys; Bruce C. Hasbrouck on the brief).
Waldron Kraemer argued the cause for respondent-cross-appellant Celanese Plastics & Specialty Co. (Kasen, Kraemer, Burns & Lovell, attorneys; Waldron Kraemer and Joan A. Lovell, of counsel; Waldron Kraemer, on the brief).
Margaret A. Wurzer argued the cause for respondent-cross-appellant Reichhold Chemical Co., (Cozen & O'Connor, attorneys; Joshua Wall and Susan M. Danielski, of counsel; Joshua Wall, on the brief).
James L. Melhuish argued the cause for respondent-cross-appellant Ciba-Geigy (Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski, attorneys; James L. Melhuish, of counsel; James L. Melhuish and Michael K. Tuzzio, on the brief).
PER CURIAM.
Plaintiffs appeal from an order granting judgment in favor of defendants[1] notwithstanding the jury's verdict in favor of plaintiffs. Defendants cross appeal from the denial of their motions for a new trial. We affirm.
In this product liability, failure-to-warn case, plaintiff Elwood Malin alleges that he became afflicted with photocontact dermatitis from exposure to a chemical manufactured by defendants. This chemical was contained in an epoxy resin which was used by plaintiff's employer, DeVoe Marine Coating Company (DeVoe), in the preparation of a patching compound. The alleged offending chemical is known as diglycidyl ether of bisphenol A, or "083". The defendants stipulated to their manufacture and distribution of "083," each under their own registered names. The patching compound prepared by DeVoe has two components, MD 3487 which is white in color, and MD 3486 which is black in color. For simplicity at trial these components were *431 referred to as the "white material" and the "black material." It is only the "black material" which contains "083."
The proofs established that Malin, who worked as a filler, was filling one-quart containers with hot "white material" on September 30, 1980 and was exposed to fumes and steam from the hot product which came up into his face. At the same time, there was another mixing tank approximately six to ten feet away, which allegedly contained the "black material." Fumes were emanating from the top of this tank which looked like steam. On one occasion when Malin stood up to stretch his legs, he walked over and looked inside the mixing tank containing the "black material." It is alleged that this exposure to the "black material" containing "083" caused Malin's photocontact dermatitis.[2]
Malin had been employed by DeVoe for approximately three and one-half years. He began as a maintenance man, but later became a filler. He had suffered from contact dermatitis for many years prior to the incident in question from exposure to various chemicals used by his employer. He had previously seen a number of doctors for treatment. He first came under the care of Dr. Herbert Allen for contact dermatitis on January 5, 1980, over eight months before he was exposed to defendant's products.
Plaintiff conceded that he only worked with the "white material" on one day, which his employer's records identified as September 30, 1980. He never worked with the "black material" containing "083." He was only exposed to the "black material" when he looked into the container mixing the "black material" on September 30, 1980.[3] Dr. Allen testified that *432 Malin contracted photocontact dermatitis and became a persistent light reactor from his exposure to heated epoxy resin containing "083." However, on cross-examination Dr. Allen conceded that he could not say that the limited exposure to the "black material" containing the "083," as described my Malin, was a competent producing cause of the condition. He did say, however, "It may be enough exposure to do it" and "I am not sure, but, I think, it is enough to say it may be possible." [Emphasis supplied.]
There was no dispute that "083" could cause contact dermatitis. One of the defendants' material safety data sheets, received into evidence, stated that "083" may be a skin sensitizer. The DeVoe label affixed to the "black material" specifically states: "May cause eye and skin irritation, sensitization or other allergic responses."
Malin contends that the "083" contained in the "black material" was defective because of a failure to provide an adequate warning that it could cause photocontact dermatitis. Malin acknowledged he had contracted contact dermatitis from exposure to some one or more of the many chemicals to which he was exposed in the DeVoe plant.[4] Thus the issues presented were extremely narrow, i.e., did plaintiff's short exposure on September 30, 1980 to the "black material" containing "083" cause his photocontact dermatitis, and did defendants have a duty to warn that their product could cause photocontact dermatitis. Defendants contend that "083" does not cause photocontact dermatitis. Furthermore, defendants contend they carried their burden of proving there was no information reasonably available or obtainable that their product could cause photocontact dermatitis. Thus they conclude they should not *433 be deemed to know of such alleged dangerous propensity, nor warn of it.
Defendants' motion at the end of the plaintiffs' case pursuant to R. 4:37-2 was denied. However, the trial judge reserved decision on defendants' motion at the end of the entire case under R. 4:40-2(a) and submitted the case to the jury. In response to a series of interrogatories, the jury returned a verdict[5] that Malin contracted photodermatitis[6] which was proximately caused by his exposure to the "black material" about which defendants had failed to give adequate warning of the dangers of their product to plaintiff. The jury found plaintiff's conduct a comparative cause of his photodermatitis, and assessed defendants' liability at 75% and plaintiff's at 25%. Defendants moved for judgment notwithstanding the verdict in accordance with R. 4:40-2(b), and alternatively moved for a new trial under R. 4:49-1. As noted, the trial judge granted the motion for judgment notwithstanding the verdict and, in accordance with R. 4:40-2(b), ruled upon the alternative motion for a new trial, which he denied. Both parties appeal.
We conclude the motion was properly granted. In view of that conclusion, we need not rule upon the denial of defendants' motion for a new trial. Notwithstanding the arduous evolution of products liability law in our State, the issue in this case is fairly clear. The defect alleged by plaintiff was solely a failure to warn or inadequacy of the warnings given. The injury alleged was specifically photocontact dermatitis, a persistent light reactor, not contact dermatitis from which Malin had been suffering long before the alleged incident. Defendants presented substantial evidence that "083" does not cause photocontact dermatitis through the testimony of preeminent authorities in the field. The only evidence in support of plaintiff's *434 theory was the testimony of Dr. Allen, which provided an inadequate basis for the assertion of proximate causation, i.e., that plaintiff's limited exposure to the chemical could "possibly" cause the condition.
Dr. Allen had coauthored an article which appeared in a recognized professional publication in November 1979.[7] In that article the authors concluded that epoxy resins, when heated, are potential photosensitizers in our environment. The article acknowledged an inability to find any prior reports linking epoxy resins to photocontact dermatitis. However, based upon Dr. Allen's diagnosis of photocontact dermatitis in eight employees of Public Service Electric & Gas Company who were allegedly exposed to heated epoxy resin, the article concluded that heated epoxy resins are potential photosensitizers.
After publication of his article, but before this suit, Dr. Allen suggested to Dr. Mack of Public Service, that Dr. William Jordan, a preeminent authority in dermatology, be requested to do tests on epoxy resin to ascertain its potential to create photosensitivity. When Dr. Jordan was unable to duplicate the photoallergic reaction to epoxy resin in guinea pigs, he examined the Public Service employees who were the subject of Dr. Allen's article. During the course of interviewing some of the employees, Dr. Jordan learned that Dr. Allen was incorrect as to the chemical which had been heated. The employees explained to Dr. Jordan that the cans they heated contained a different chemical. After his examinations of the Public Service employees, as well as a later examination of Malin after this suit was instituted, Dr. Jordan concluded that none of them had photocontact dermatitis which had developed as a photoallergic reaction from exposure to heated epoxy resins or "083." Dr. Jordan testified on behalf of defendants in this case.
*435 When a plaintiff sues under strict liability, there is no need to prove that the manufacturer knew or should have known of any dangerous propensities of its product. Such knowledge is imputed to the manufacturer as a matter of law. Freund v. Cellofilm Properties, Inc., 87 N.J. 229, 239 (1981). This does not, however, relieve a plaintiff from the burden of proving that the product did have such a dangerous propensity nor, in this case, that the failure or inadequacy of the warning of the dangerous propensity was a proximate cause of any photocontact dermatitis from which Malin may be suffering.
Malin's proofs were limited to the testimony of Dr. Allen and the article which he coauthored. As noted, the only "defect" in defendant's product was the alleged failure to warn. To the extent that the "risk-utility analysis" implicates the reasonableness of the manufacturer's conduct, strict liability law continues to manifest that part of its heritage attributable to the law of negligence. O'Brien v. Muskin Corp., 94 N.J. 169, 181 (1983). By implication, risk-utility analysis includes factors such as the "state-of-the-art" at the time of the manufacture of the product. The "state-of-the-art" refers to the existing level of technological expertise and scientific knowledge relevant to a particular industry at the time a product is designed. Id. at 182. Risk-utility analysis is not a petrified, but a dynamic process. Where a particular product falls on the risk-utility continuum will depend on the facts of each case. Although state-of-the-art evidence may be dispositive on the facts of a particular case, it does not constitute an absolute defense apart from risk-utility analysis. Id. at 183. State-of-the-art evidence, together with other evidence relevant to risk-utility analysis, however, may support a judgment for a defendant. Id. at 184.
The standard for granting judgment n.o.v. is relatively mechanical and does not involve the weighing of evidence. Johnson v. Salem Corp., 97 N.J. 78, 92 (1984). The test for a motion under R. 4:40-2 (judgment notwithstanding the verdict) *436 is the same as that governing motions under R. 4:37-2(b) (involuntary dismissal at the end of the plaintiff's case), and R. 4:40-1 (judgment after the close of evidence). Pressler, Current N.J. Court Rules, Comment R. 4:40-2 (1986). That test was articulated in Dolson v. Anastasia, 55 N.J. 2, 5-6 (1969).
... if, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied. Bossa v. Vornado, Inc., 42 N.J. 355 (1964); Bell v. Eastern Beef Co., 42 N.J. 126 (1964); Franklin Discount Co. v. Ford, 27 N.J. 473, 490 (1958). The point is that the judicial function here is quite a mechanical one. The trial court is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion.
In considering a motion to dismiss, the trial court should decide whether, viewing the evidence in the light most favorable to plaintiff, the jury might conclude that the plaintiff had proven the existence of a defect and that the defect was a proximate cause of his injury. If not, the court should grant the motion as a matter of law. R. 4:37-2(b); O'Brien v. Muskin Corp., supra, 94 N.J. at 185. If the minds of reasonable men could not differ on whether the utility of the product outweighs any risks posed, or vice versa, then the court can make the appropriate determination as a matter of law. Id. at 186. That is what occurred in this case. See also Johnson v. Salem Corp., 97 N.J. at 89, 93-94 (affirming judgment for plaintiff n.o.v. entered as a matter of law).
In reaching his decision the trial judge relied upon the following language from Feldman v. Lederle Laboratories, 97 N.J. 429, 452 (1984):
[As] to warnings, generally conduct should be measured by knowledge at the time the manufacturer distributed the product. Did the defendant know, or should he have known, of the danger, given the scientific, technological, and other information available when the product was distributed; or, in other words, did he have actual or constructive knowledge of the danger? The Restatement, supra, has adopted this test in comment j to section 402A, which reads in pertinent part as follows:

`Directions or warning. In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use. * * * Where the product contains an *437 ingredient * * * whose danger is not generally known, or if known is one which the consumer would reasonably not expect to find in the product, the seller is required to give warning against it, if he has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of the presence of the ingredient and the danger. [Emphasis supplied by Feldman court.]
The trial judge then reviewed the evidence as to Dr. Allen's article and the delivery of the "083" to Malin's employer and concluded that the knowledge in the industry at the time of delivery was insufficient to require defendants to give warning. The judge stated:
The court finds that reasonable men cannot differ on the issue of available knowledge, that it is clear that based on the time periods involved in this particular factual setting that there was no available knowledge to the defendants which would have required them to issue the warnings necessary to establish product liability in this case.
We agree with the conclusion of the trial judge, but disagree with the reasons upon which it is based. In Feldman v. Lederle Laboratories, supra, the Supreme Court noted that a manufacturer is held to the standard of an expert in the field, and that a reasonably prudent manufacturer will be deemed to know of reliable information generally available or reasonably obtainable in the industry or in the particular field involved. 97 N.J. at 452-453. The Court also stated that in strict liability warning cases, unlike negligence cases, the defendant should properly bear the burden of proving that the information was not reasonably available or obtainable and that it therefore lacked actual or constructive knowledge of the defect. Id. at 455-456. Furthermore, the state-of-the-art at the time of delivery of the product does not indefinitely protect a defendant in a failure-to-warn case. As the Feldman Court noted, "although a manufacturer may not have actual or constructive knowledge of a danger so as to impose upon it a duty to warn, subsequently acquired knowledge, both actual and constructive, also may obligate the manufacturer to take reasonable steps to notify purchasers and consumers of the newly-discovered danger." Id. at 456-457.
*438 Notwithstanding some of the incorrect conclusions of the trial judge, the motion for judgment n.o.v. was properly granted. We have carefully reviewed all of the evidence relating to the alleged inadequacy or failure to warn aspect of this case. Testimony revealed that "083" was delivered to the plant in tank cars and distributed by pipe to the areas of the plant where it would be used. Delivery of the product was accompanied by data sheets concerning the product. There was also a "product bulletin" from defendant Reichhold, in which it warns concerning "083" as follows:
Uncured EPOTUF resins and hardeners may produce irritation following frequent and prolonged contact with the skin. Mixing of EPOTUF resins and hardeners should be carried out in areas provided with exhaust ventilation discharging to the outside atmosphere. Avoid breathing vapors and avoid contact with skin, eyes or clothing. Hands or other skin areas coming in contact with EPOTUF resins and hardeners should be washed thoroughly with soap and water. When amine curing agents are used, direct contact with skin must be prevented. Rubber gloves and eye protection should be worn when handling.
In his summation to the jury, plaintiff's counsel referred to a piece of paper as coming from defendant Ciba-Geigy containing the statement: "Caution: may cause irritation. Avoid contact with eyes or prolonged contact with skin." With regard to Celanese, plaintiff's counsel quoted this warning: "This product contains the material epoxy resin which may cause skin and eye and/or skin sensitization after repeated contact." No contention is made that Devoe did not convey these warnings to its employees, including Malin, see Menna v. Johns-Manville Corp., 585 F. Supp. 1178 (D.N.J. 1984); Butler v. P.P.G. Industries, Inc., 201 N.J. Super. 558, 563-564 (App.Div. 1985), but rather that the warnings were inadequate. Malin gave copies of the Devoe labels to Dr. LoPresti, Dr. Allen's associate, which, as noted, contained essentially the same warnings.
We first observe that these warnings, admittedly given to plaintiff's employer, substantially warn of skin irritation, sensitization and other allergic responses and caution against contact or inhalation. Yet, plaintiff suggested to the jury that these warnings were inadequate to warn of a propensity of the *439 product to cause photocontact dermatitis as a specific allergic response to exposure to the product. In a product liability case plaintiff has the burden of proving that the failure to give adequate warnings was a proximate cause of the accident and injuries and that the failure was a substantial factor in bringing about the happening of the accident. See Campos v. Firestone Tire & Rubber Co., 98 N.J. 198, 210 (1984). In that case, the Supreme Court quoted with approval the following from a law review article:
If the basis for recovery under strict liability is inadequacy of warnings or instruction about dangers, then plaintiff would be required to show that an adequate warning or instruction would have prevented the harm. Keeton, "Products Liability  Inadequacy of Information," 48 Tex.L.Rev. 398, 414 (1970). [98 N.J. at 209.]
Dr. Allen's diagnosis of photocontact dermatitis was contested by Drs. Jordan and Harber. Although this might present a factual issue for determination by the jury, the evidence did not show that any photodermatitis from which plaintiff might be suffering was proximately caused by exposure to "083." Our courts have repeatedly held that the existence of a possibility of a defendant's responsibility for plaintiff's injuries is insufficient.
In the absence of direct evidence, it is incumbent upon plaintiff to prove not only the existence of such possible responsibility, but the existence of such circumstances as would justify the inference that the injury was caused by the wrongful act of defendant and would exclude the idea that it was due to a cause with which defendant was unconnected. While proof of certainty is not required, the evidence must be such as to justify an inference of probability as distinguished from the mere possibility of negligence on the part of the defendant. [Callahan v. National Lead Co., 4 N.J. 150, 154-155 (1950).]
This plaintiff had suffered from substantial skin disorders long before his alleged exposure to the "black material" on September 30, 1980. Dr. Allen's testimony as to proximate causation was specifically couched in terms of possibility, rather than probability. As such, inferences drawn by the jury based on that opinion were mere speculation.
Our review of all of the evidence leads us to conclude that the motion at the end of plaintiffs' case should have been granted, *440 as well as the motion at the end of the entire case. Plaintiff failed to prove as a matter of law that the condition from which he allegedly suffered was proximately caused by an inadequacy or failure on the part of defendants to warn of a dangerous propensity of their product. Accordingly, the judgment n.o.v. was properly granted.
As noted, our disposition of plaintiffs' contention concerning the judgment n.o.v. makes it unnecessary to review defendants' cross appeals from the denial of their motions for a new trial.
Affirmed.
NOTES
[1] Prior to trial summary judgment was granted in favor of Union Carbide from which no appeal has been taken.
[2] Malin initially contended that it was his exposure to the "white material" which caused his condition until it was learned that the "white material" did not contain "083."
[3] The employer's records indicated the black material was not being mixed on that day, but rather on October 2, 1980.
[4] In January 1980, Malin made a complaint to OSHA[*] about the chemical hazards at his plant. DeVoe terminated Malin's employment in February 1980 because of the recurring rashes. With the assistance of his union, Malin was rehired with his diagnosis changed to "chapped skin." ([*]Occupational Safety and Health Act of 1970, 29 U.S.C.A. §§ 651-678.)
[5] The case was tried to the jury on the issue of liability only.
[6] Dr. Allen referred to the condition as photo contact dermatitis, but the interrogatory referred to it as photodermatitis.
[7] Allen & Kaidbey, "Persistent Photosensitivity Following Occupational Exposure to Epoxy Resin," The Archives of Dermatology, v. 115, November, 1979.