Antonio **CIPOLLONE**, individually and as executor of the estate of Rose D. Cipollone, Plaintiff,

v.

**LIGGETT GROUP, INC., Philip Morris Incorporated, and Lorillard, Inc., Defendants.**

Civ. A. No. 83–2864.

United States District Court, D. New Jersey.

April 21, 1988.

1488

Budd Larner Gross Picillo Rosenbaum Greenberg & Sade, Marc Z. Edell, Short Hills, N.J., Wilentz, Goldman & Spitzer, Alan M. Darnell, Woodbridge, N.J., for plaintiff.

Greenbaum, Rowe, Smith, Ravin, Davis & Bergstein, Alan S. Naar, Woodbridge, N.J., for defendant Liggett Group, Inc.

Brown & Connery, Raymond F. Drozdowski, Westmont, N.J., for defendant Philip Morris Inc.

Stryker, Tams & Dill, William S. Tucker, Newark, N.J., for defendant Lorillard, Inc.

## OPINION

SAROKIN, District Judge.

### FACTUAL BACKGROUND [1]

The court will make no attempt to outline all of the evidence which has been submitted in this case, but concludes for the purposes of the pending motions that the jury could reasonably infer and find as follows:

Rose DeFrancesco Cipollone was born in 1925 and began to smoke at age 16, in the year 1942, while she was still in high school. She testified that she began to smoke because she saw people smoking in the movies, in advertisements, and looked upon it as something "cool, glamorous and grown-up" to do. She began smoking Chesterfields (manufactured by defendant Liggett Group, Inc.) primarily because of advertisements of "pretty girls and movie stars", and because Chesterfields were described in the advertisements as "mild". By the end of 1943 she was smoking a pack a day of Chesterfields. She met her husband, plaintiff Antonio Cipollone in 1946. In February 1947, Rose and Antonio Cipollone were married.

Mrs. Cipollone attempted to quit smoking while pregnant with her first child in 1947, but even then she would sneak cigarettes. While she was in labor she smoked an entire pack of cigarettes, provided to her at her request by her doctor, and after the birth of her first child she resumed smoking. She smoked a minimum of a pack a day and as much as two packs a day.

In 1955, she switched from Chesterfields to L & M cigarettes (also manufactured by Liggett) because L & M cigarettes were filtered, and she believed that the filter would trap whatever was "bad" for her in cigarette smoking. She relied upon advertisements which supported that contention. She continued to smoke approximately a pack and one-half a day until 1968, when she switched to Virginia Slims (manufactured by defendant Philip Morris Incorporated). In this instance, she changed because the cigarettes were glamorous and long, and were associated with beautiful women—and the liberated woman. In this period she smoked again between one and two packs a day.

Because she developed a smoker's cough and heard reports that smoking caused cancer, she tried to cut down on her smoking. These attempts were unsuccessful. Throughout this period her husband opposed her smoking and frequently brought to her attention articles that stated that smoking was harmful.

She testified that she believed that the "tobacco companies wouldn't do anything that was really going to kill you", and she

---

1. The court, in deciding defendants' motions for directed verdict, must view the evidence "in the light most favorable to the nonmoving party." *Macleary v. Hines,* 817 F.2d 1081, 1083 (3d Cir. 1987).

read and relied upon statements from the industry in the media that indicated that there was no specific proof that cigarette smoking caused cancer.

Mrs. Cipollone switched to lower tar and nicotine cigarettes based upon advertising from which she concluded that those cigarettes were safe or safer. In the 1970's she switched to Parliaments (manufactured by Philip Morris) because the filter was "recessed". The ads professed, and she concluded, that the fact that the filter was recessed made smoking safer. In 1974, she changed from Parliaments to True cigarettes (manufactured by Lorillard, Inc.) based upon the recommendation of her family physician who indicated that if she had to smoke she should smoke True. Again, she saw and relied upon the True ads that indicated that they were low in tar and nicotine, and that reinforced her view that they were safe or safer. In 1981 her cancer was diagnosed, and even though her doctors advised her to stop, she was unable to do so. She even told her doctors and her husband that she had quit when she had not, and she continued to smoke until June of 1982 when her lung was removed. Even thereafter she smoked occasionally—in hiding. She stopped smoking in 1983 when her cancer had metastasized and she was diagnosed as fatally ill. Mrs. Cipollone eventually died on October 21, 1984.

There has been overwhelming evidence presented to the jury from which they could conclude that smoking causes lung cancer, that smoking caused lung cancer in Mrs. Cipollone, and that lung cancer was the cause of her eventual death.

The conduct of Mrs. Cipollone must be viewed in light of the activities of the defendants during this same time period. In respect to the conduct of the defendants, the jury could reasonably infer and find as follows:

There was a time period in which the defendants might reasonably contend that the risks of cigarette smoking were not clearly known and defined. Gradually, however, the scientific and medical evidence began to mount beginning in the 1950's, and eventually the accepted view in the medical and scientific community was and is that smoking causes lung cancer and other diseases. For a considerable period of time in Mrs. Cipollone's early smoking career, defendants and others in the tobacco industry not only failed to warn of the risks of smoking but to the contrary suggested that cigarette smoking was safe and harmless and, indeed, that this contention even had the support of medical doctors.

Early TV ads showed machines akin to the Wizard of Oz, including "the Acuray", a brain machine which assured a safe cigarette, and the "Quality Detective". Ads referred to existing cigarette "research laboratories" and contained phrases such as "best for you", "better quality" "chemical analysis", "mild", etc. One print ad suggested that smoking a particular cigarette was "Just What The Doctor Ordered".

Evidence presented by the plaintiff, particularly that contained in documents of the defendants themselves, indicates the development of a public relations strategy aimed at combating the mounting adverse scientific reports regarding the dangers of smoking. The evidence indicates further that the industry of which these defendants were and are a part entered into a sophisticated conspiracy. The conspiracy was organized to refute, undermine, and neutralize information coming from the scientific and medical community and, at the same time, to confuse and mislead the consuming public in an effort to encourage existing smokers to continue and new persons to commence smoking.

In this regard plaintiff has presented evidence, again, mainly from the files of the defendants themselves, which demonstrates a deliberate intent and purpose to challenge all adverse medical and scientific evidence regarding smoking, irrespective of its truth or validity. Indeed, the strategy to meet the claims of the scientific community was formulated before the contents of the scientific evidence were known. Defendants determined that if a report was publicized which demonstrated the dangers of cigarette smoking, attempts would be made to offset it, and even attack the qualifications of the researcher, if necessary.

Defendants made no attempt to conduct any research before the 1950's despite growing scientific evidence of risks.[2] Plaintiff offered evidence demonstrating that adverse results generated by research eventually conducted by the cigarette companies themselves were suppressed and concealed. At least one scientist testified as to threats made to him if he published his findings, and there was other evidence of attempts to suppress or coerce others.

The most subtle evidence of misrepresentation comes from the creation of the Tobacco Institute Research Committee (Council for Tobacco Research). The foregoing was created and highly publicized as the industry's good faith effort to search for the truth, learn the risks of cigarette smoking, and then supposedly report those findings to the general public. Plaintiff has presented evidence from which the jury could reasonably conclude that the creation of this entity and the work performed was nothing but a hoax created for public relations purposes with no intention of seeking the truth or publishing it. Evidence has been presented that the research actually conducted was unrelated or not pertinent to the real health issues. Furthermore, a minimal amount was invested when compared to sales, profits and amounts expended for advertising.

Defendants were well aware of the extreme difficulty smokers had and have in quitting smoking. They knew based upon sophisticated research that a smoker who found it difficult to quit, particularly faced with claims of hazards or risks, would focus on any rationalization to justify his or her continued smoking. Plaintiff presented expert testimony that Mrs. Cipollone was heavily dependent on tobacco and would grasp at any rationalization to continue, and that the cigarette companies provided that rationalization on a steady basis. The defendants and others in the industry repeatedly and publicly questioned the scientific and medical literature which linked smoking with cancer and other diseases. Furthermore, plaintiff offered expert testimony which demonstrated that even after the companies ceased making specific health claims, the vast advertising of the industry created a consistent message of purity, health, safety, reduced tars and nicotine, etc. This campaign served to create doubt in the minds of the consumer as to smoking dangers, and played on the weakness of those who were either addicted and/or dependent.

Plaintiff presented testimony that $250,000 is spent per hour 24 hours a day, 7 days a week, 365 days a year on cigarette advertising. Even in connection with the decisions to reduce tar and nicotine and advertise its benefits, defendants did not and do not concede any relevance to health for fear of making an admission. Rather they contend that such products are merely an accession to a baseless consumer concern—an effort to placate and humor a misguided public which believes in a risk that does not exist. The intensity of the advertising and public relations was sufficient to create the desired doubt in the minds of the consumer, and overwhelm or undermine pronouncements as to the dangers.

A jury might reasonably conclude from the foregoing that defendants in particular, and the industry in general, intentionally and willfully ignored the known health consequences to consumers from the sale of their products; that their so-called investigation into the risks was not to find the truth and inform their consumers, but merely an effort to determine if they could refute the adverse reports and maintain their sales. Defendants were confronted with a choice between the health and lives of the consumers and profits and the jury could reasonably conclude that the industry chose profits. Health of consumers does not receive even passing mention in the internal documents of the defendants, except as to the advantage to be gained by expressing such concern publicly. No witness presented by plaintiff was confronted with a single advertisement by *any* tobacco

---

**2.** One CEO was satisfied that there was no link between smoking and lung cancer, because he smoked and did not get cancer.

company voluntarily acknowledging even the possible existence of a risk to health.

As to plaintiff's alternative safer design claim, there has been evidence presented that a safer design was available, capable of being manufactured and sold, and that there was an election not to do so for fear that to market such a product would constitute an admission that other products already on the market were not safe but could have been. Evidence was presented to confirm that Mrs. Cipollone would have at least tried the new cigarette, and that had she continued to smoke it, it would have reduced her risk of lung cancer. In this instance, as well as all aspects of the research being conducted by the companies and under the auspices of the Tobacco Institute, there was the ever prevalent presence of lawyers determining, or at least participating in what research should be conducted, and what should be published or made available to the general public. A jury might conclude that this was just a normal business precaution, but in this case it could reasonably conclude that research was being conducted to improve the public relations image for the tobacco companies or to avoid liability, but never to provide the consumer with any adverse or necessary information as to health which might result from such research.

Plaintiff presented evidence that defendants directed particular efforts toward influencing doctors. Recognizing that smokers would look to their doctors for advice and that many doctors were smokers themselves, the industry created a magazine entitled Tobacco and Health (Research), and mailed it free to practically every doctor in the country, as well as many others in positions of influence. The publication was a blatant and biased account of the smoking "controversy". It had one purpose—to convince doctors that the claimed risks were unfounded, unsupported or refuted. There was also chilling evidence that means were being considered to combat the American Cancer Society's anti-smoking efforts in the public schools.

It may not be appropriate to draw any inference at this stage of the proceeding— before the defendants have presented their case—arising from the internal inconsistency of the contentions of the defendants. Those contentions, however, have manifested themselves in the openings and cross examination of plaintiff's witnesses. While asserting that the evidence regarding the relationship between smoking and lung cancer is deficient and unreliable and without scientific and medical basis, and having repeatedly and consistently taken that position publicly up to and including the present, defendants assert that Mrs. Cipollone was responsible for not accepting and relying upon this allegedly inaccurate and unsupported information. In essence, defendants contend that Mrs. Cipollone was sufficiently warned by what these defendants contend was unproven and unreliable, and is barred from recovering from them if or because she believed what *they* said about the subject of smoking and health.

That precarious line which the defendants seek to walk between warnings and causation may not be sufficient to preclude defendants from taking these seemingly inconsistent positions, but it may permit the jury to draw an adverse inference as to the good faith and credibility of defendants' factual assertions.

The irony of defendants' position is compounded by defendants further assertion that the particular cancer suffered by Mrs. Cipollone is not the type of cancer caused by or associated with smoking while simultaneously contending that there is *no* type of cancer which has been proven to be caused by smoking.

The jury, based upon the foregoing, may reasonably conclude that 1) defendants negligently failed to conduct research when it was warranted; 2) that they made affirmative health claims which were untrue; 3) that they failed to warn of risks about which they had knowledge; 4) that they deliberately and intentionally refuted, denied, suppressed and misrepresented facts regarding the dangers of smoking 5) that they withheld knowledge of and failed to market a safer cigarette in order to avoid any admission of liability; and 6) that they engaged in an industry wide conspiracy to

accomplish all of the foregoing in callous, wanton, wilful and reckless disregard for the health of consumers in an effort to maintain sales and profits.

The evidence presented also permits the jury to find a tobacco industry conspiracy, vast in its scope, devious in its purpose and devastating in its results. The jury may reasonably conclude that defendants were members of and engaged in that conspiracy with full knowledge and disregard for the illness and death it would cause, and that Mrs. Cipollone was merely one of its victims.[3]

Having determined what a reasonable jury could find and conclude from the evidence presented in this case, the court will now address the various legal claims asserted by the plaintiff, and the defendants' motions addressing the same.

DISCUSSION

1. *Design Defect*

Plaintiff's remaining design defect claim is that defendants failed to market a safer palladium cigarette. Defendants contend that plaintiff has presented no evidence from which the jury could find that defendants' conduct in this regard proximately caused Mrs. Cipollone's illness and subsequent death.

As to proximate cause, plaintiff puts forward the opinion of Dr. Harris that Mrs. Cipollone's risk of developing lung cancer would have been reduced by between 8% to 17% if she had switched to the palladium cigarette in 1971. In reaching that conclusion, Dr. Harris made the following assumptions: that the palladium cigarette is "safer" than other cigarettes; that the palladium cigarette could have been marketed by 1971; that if the palladium cigarette had been marketed in 1971, Mrs. Cipollone would have switched to it and continued to smoke it until she ultimately stopped smoking.

Plaintiff has not presented evidence from which the jury could find or infer the final

fact mentioned above—that plaintiff would have continued to smoke the palladium cigarette. Dr. Cohen testified that, in his opinion, Mrs. Cipollone would have tried the product. Dr. Cohen admitted, however, that he could not predict whether Mrs. Cipollone would have found the palladium cigarette satisfactory and continued to use it. A conclusion by the jury that Mrs. Cipollone would have smoked the palladium cigarette from 1971 until she stopped smoking would be based on speculation, not evidence. Thus, there is no basis upon which the jury could conclude that there would be any reduction in the risk to Mrs. Cipollone, due to the absence of competent proof that she would have smoked the palladium cigarette for any substantial period.

Additionally, defendants contend that plaintiff has failed to prove proximate cause, even accepting Dr. Harris' conclusion and its predicates.

■ The parties disagree as to the appropriate test for measuring causation on the design defect claim. Defendants argue, with citation to products liability cases, that plaintiff must present evidence that the alternative design more likely than not would have prevented plaintiff's injury. *See, e.g., Brown v. United States Stove Co.,* 98 N.J. 155, 174, 484 A.2d 1234 (1984). Plaintiff responds that, under the so-called "lost chance" doctrine, he must present evidence that defendants' conduct increased plaintiff's risk of contracting lung cancer and that such increased risk was a "substantial factor" in producing plaintiff's condition. *See, e.g., Evers v. Dollinger,* 95 N.J. 399, 417, 471 A.2d 405 (1984).

No New Jersey court has ruled expressly on the applicability of the "lost chance" doctrine to product liability cases. This court, in the exercise of its diversity jurisdiction, must predict how the New Jersey Supreme Court would decide this question. *See, e.g., Hon v. Stroh Brewery,* 835 F.2d 510, 512 (3d Cir.1987). The court predicts

---

**3.** The ruling of the Third Circuit 789 F.2d 181 (3d Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 907, 93 L.Ed.2d 857 (1987) has precluded the plaintiff from offering evidence to establish that this conspiracy continues to the present.

The jury by virtue of that ruling has been deprived of evidence proffered by plaintiff to establish an intentional and deliberate campaign to undermine and neutralize the Surgeon General's warnings.

that the New Jersey Supreme Court would not apply the "lost chance" doctrine to this case.

Generally, the test of proximate cause in strict product liability actions is whether defendant's conduct was a substantial factor in bringing about an accident that caused plaintiff's injury. *See, e.g., Malin v. Union Carbide Corp.*, 219 N.J.Super. 428, 439, 530 A.2d 794 (App.Div.1987); *Hull v. Getty Refining & Marketing Co.*, 202 N.J.Super. 461, 467, 495 A.2d 445 (App. Div.1985). In *Brown v. United States Stove Co.*, a design defect case, the New Jersey Supreme Court ruled that a plaintiff failed to present a jury question on proximate cause in the absence of evidence that the alternative design would "realistically or likely ... have prevented the kind of injury" incurred by plaintiff. 98 N.J. at 174, 484 A.2d 1234; *see id.* at 184, 484 A.2d 1234 (Schreiber, J., concurring) (stating that plaintiff had the burden of establishing that the proposed alternative design "would have prevented the accident"). In *Campos v. Firestone Tire & Rubber Co.*, a failure to warn case, the Supreme Court applied a similar test for determining proximate cause—that "with a proper warning the accident would not have occurred." 98 N.J. 198, 211, 485 A.2d 305 (1984); *see Malin*, 219 N.J.Super. at 439, 530 A.2d 794.

No product liability cases refer to the "lost chance" doctrine. The New Jersey Supreme Court first applied this doctrine in the medical malpractice context, ruling that a physician who failed to diagnose cancer could be held liable if plaintiff could demonstrate that the physician's conduct increased plaintiff's risk and that this increased risk was a substantial factor in producing plaintiff's condition. *Evers v. Dollinger*, 95 N.J. 399, 417, 471 A.2d 405 (1984). In *Hake v. Manchester Township*, the Supreme Court applied *Evers* to a claim for failure to rescue—the court held that given defendant's breach of a duty to assist plaintiff, plaintiff need show only that there was "a substantial possibility" that plaintiff might have been rescued if defendants acted properly. 98 N.J. 302, 311, 486 A.2d 836 (1985).[4]

Arguably, the rationale of the "lost chance" doctrine—that a plaintiff can recover for damage suffered as the result of nonfeasance that reduced the probability of avoiding an injury actually sustained, *see Herber v. Johns–Mansville Corp*, 785 F.2d 79, 82–83 (3d Cir.1986)—could extend to product liability claims based on a failure to act. Manufacturers who fail to warn or to market a safer alternative design breach a duty that leads to an increased risk of injury to consumers. Yet, New Jersey courts have failed to apply the "lost chance" rule in product liability cases after *Evers* (*see, e.g., Brown*, 98 N.J. 155, 484 A.2d 1234; *Campos*, 98 N.J. 211, 485 A.2d 305) and after *Hake* (*see, e.g., Malin*, 219 N.J.Super. 428, 530 A.2d 794; *Hull*, 202 N.J.Super. 461, 495 A.2d 445).[5] There exists some doubt as to whether the "lost chance" doctrine, in actuality, represents a different measure of proximate cause than that set forth in product liability cases cited by defendants.[6] To the extent that the

---

**4.** In *Ayers v. Jackson Township,* a toxic tort case, the New Jersey Supreme Court declined to permit recovery under the New Jersey Tort Claims Act for enhanced risk of disease absent a demonstration that plaintiff contracted the disease or that the onset of the disease is reasonably probable. 106 N.J. 557, 598–99, 525 A.2d 287 (1987). The court discussed *Evers,* noting in particular the *Evers* court's refusal to address the compensability of enhanced risk in the abstract. *Id.* at 593, 525 A.2d 287. The *Ayers* court focused on enhanced risk as a type of injury, not on the "lost chance" doctrine as a means of proving proximate cause.

**5.** At argument, plaintiff suggested that this was so because the lost chance doctrine applied only in cases where plaintiff's injury developed over a substantial period of time. In failure to rescue cases such as *Hake,* however, the doctrine applied in situations involving a discrete accident causing immediate harm.

**6.** The tests put forth by both parties require a plaintiff to show that defendant's conduct was a "substantial factor" contributing to plaintiff's loss. The New Jersey Supreme Court has stated, "Our concepts of causation for failure to act are generally expressed in terms of whether the conduct may be viewed as a "substantial factor contributing to the loss." *Hake v. Manchester Township,* 98 N.J. 302, 311, 486 A.2d 836 (1985) (citing both *Brown* and *Evers*); *see Battista v. Olson,* 213 N.J.Super. 137, 149, 516 A.2d 1117 (App.Div.1986).

doctrine eases the burden of establishing proximate cause, the court predicts that the New Jersey Supreme Court, if presented squarely with the question, would fail to stray from its prior rulings in *Brown* and *Campos*.[7]

■ Therefore, plaintiff, in order to prevail on his alternative design claim, must present evidence from which the jury could conclude that Mrs. Cipollone's use of the palladium cigarette would "realistically or likely ... have prevented [her] injury." *Brown*, 98 N.J. at 174, 484 A.2d 1234. Dr. Harris' testimony that use of the cigarette would have reduced plaintiff's risk of contracting cancer by 8% to 17% does not satisfy this burden.[8] In products liability cases, the existence of a possibility of defendant's responsibility for plaintiff's injuries is insufficient to establish proximate cause. *See Malin v. Union Carbide Corp.*, 219 N.J.Super. 428, 439, 530 A.2d 794 (App.Div.1987).

Plaintiff has not presented evidence from which the jury could reasonably conclude that defendants' failure to market a palladium cigarette proximately caused Mrs. Cipollone's illness and death. The court, therefore, grants defendants' motion for a directed verdict as to plaintiff's design defect claim.

At this time, the court does not determine whether its ruling requires the striking of any testimony introduced during plaintiff's case. The court notes that evidence relevant to the alternative design claim—such as defendants' motives in not developing or marketing a safer cigarette—may be relevant to other claims remaining in the case. The court will rule on

specific testimony and exhibits if raised by defendants on a motion to strike.

### 2. *Failure to warn*

#### a. Philip Morris and Lorillard

■ Plaintiff, in opposing defendants' motion for summary judgment, conceded that its failure to warn claims against Philip Morris and Lorillard are preempted because Mrs. Cipollone did not smoke their cigarettes until after the effective date of the federal labeling act. Brief in Opposition to Defendants' Motion for Summary Judgment at 10 n. 5. However, plaintiff now contends that he possesses viable claims against these defendants based on their pre-1966 failure to warn.

The court, assuming that plaintiff has not waived such claims, concludes that these theories fail as a matter of law. As a matter of products liability law, these defendants possessed no duty to warn plaintiff until plaintiff purchased their products. Plaintiff contends, however, that defendants, by making affirmative statements regarding smoking and health, undertook a duty to warn plaintiff of the hazards of smoking. The court rejects this theory, concluding that the New Jersey Supreme Court would not apply Restatement (Second) of Torts § 323 to plaintiff's failure to warn claims.

The court grants the motions of Philip Morris and Lorillard for a directed verdict on plaintiff's failure to warn claims.[9]

#### b. Liggett

Liggett presents several reasons why it is entitled to a directed verdict on plaintiff's failure to warn claims. The court rejects each of Liggett's contentions.

7. The recently passed products liability legislation states that a manufacturer may not be held liable for a design defect if there did not exist a feasible alternative design "that would have prevented the harm." N.J.S.A. § 2A:58C–3(a)(1). Thus, at least for any cases arising after the act's passage, the "lost chance" doctrine is inapplicable. The court, without holding that this provision of the statute applies retroactively to this case, finds that the New Jersey Supreme Court is unlikely to modify the standards set forth in *Brown* and *Campos* only for pending cases not covered by the statute.

8. Plaintiff, in his papers in opposition to this motion, does not argue that Dr. Harris' testimony satisfies the burden set forth in *Brown* and *Campos*.

9. This ruling does not necessarily preclude plaintiff's intentional tort and conspiracy claims against these defendants. *See infra* at pp. 1499–1500.

■ Section 3(a)(2) of the 1987 New Jersey product liability act, codified at N.J.S.A. § 2A:58C–3(a)(2), does not relieve Liggett of any duty to warn.[10] Section 2 of the act, codified at N.J.S.A. § 2A:58C–2, describes three types of product liability actions recognized by New Jersey law: a. cases involving manufacturing defects; b. cases involving products that "failed to contain adequate warnings or instructions"; and c. cases involving products that were "designed in a defective manner." Section 3 of the act provides defenses only against claims that a product "was designed in a defective manner." N.J.S.A. § 2A:58C–3(a). Therefore, the defense set forth in Section 3(a)(2) is not available to Liggett as against plaintiff's failure to warn claims—claims considered by the statute to be distinct from plaintiff's design defect claim.

■ Plaintiff has submitted evidence from which the jury could infer that, prior to 1966, ordinary consumers were not adequately informed of the health risks of smoking. Plaintiff has presented expert testimony to that effect and has presented evidence that, given defendants' statements and advertisements during that period, a warning as to the hazards of smoking was necessary. Plaintiff has presented evidence from which the jury could conclude that Liggett possessed a duty to warn as to the health risks of smoking.

Plaintiff has presented evidence from which a jury could conclude that defendants should have warned of the health risks of smoking at various times prior to 1966. Dr. Harris' testimony as to the state of the art at various times is sufficient

evidence as to the general nature of the warnings. Plaintiff is not required to provide examples of specific warnings that should have been given.[11]

Plaintiff has presented evidence from which the jury could conclude that Liggett's pre–1966 failure to warn proximately caused Mrs. Cipollone's illness and death. Whether Mrs. Cipollone, given her awareness of the health risks of smoking, would have changed her behavior in the face of Liggett's warnings is a factual question for the jury. Plaintiff has presented evidence that Mrs. Cipollone discounted information of smoking's dangers because she believed that the cigarette companies would not market a dangerous product. The jury could reasonably infer from the evidence that Liggett's actions fostered Mrs. Cipollone's belief. Furthermore, plaintiff has presented expert testimony that ambiguity in the information environment was critical to Mrs. Cipollone's continued smoking—if defendants had warned of the dangers rather than disputing them, no such ambiguity would have existed.

With further respect to the question of proximate cause, plaintiff has presented evidence from which the jury could conclude that Mrs. Cipollone's smoking after 1966, in the face of congressionally mandated warnings, was not an intervening or superseding cause that would relieve Liggett of liability. Plaintiff has presented evidence that Mrs. Cipollone's tobacco dependence prevented her from making a free and fully informed decision as to her continued smoking. Plaintiff has also presented evidence that Liggett knew of the dependency-causing characteristics of cigarettes,

10. Section 3(a)(2) provides that a manufacturer may not be held liable on a design defect claim if "[t]he characteristics of the product are known to the ordinary consumer or user, and the harm was caused by an unsafe aspect of the product that is an inherent characteristic of the product and that would be recognized by the ordinary person who uses or consumes the product with the ordinary knowledge common the class of persons for whom the product is intended."

11. *Palmer v. Liggett Group*, 825 F.2d 620, 627 (1st Cir.1987), is not to the contrary. The First Circuit, in concluding that imposition of tort

liability for inadequate warnings constituted direct regulation prohibited by federal law, hypothesized as to the nature of proceedings in such a liability trial:

A trial court would not merely submit the question of whether the warning was adequate. Evidence pro and con would have to be offered, including specific examples of what sort of warning reasonably was called for, how it was to be given, and the like.

This statement does not purport to describe an element of a failure to warn claim of any particular state, including New Jersey.

failed to warn of these characteristics, and sought through their pre–1966 activities to provide a rationale through which tobacco-dependent smokers could justify continued smoking. The jury could reasonably conclude that Liggett's pre–1966 activity proximately caused Mrs. Cipollone's injuries.

The court denies Liggett's motion for a directed verdict on plaintiff's failure to warn claims.

### 3. *Express warranty*

#### a. Liggett

■ Liggett presents several reasons why it is entitled to a directed verdict on plaintiff's express warranty claim. The court rejects each of Liggett's contentions.

Plaintiff has presented evidence that Liggett made "affirmations of fact," within the meaning of N.J.S.A. § 12A:2–313(1)(a), concerning the health risks of smoking. Courts have treated statements in advertisements as express warranties under this provision. *See, e.g., Collins v. Uniroyal, Inc.,* 64 N.J. 260, 262–63, 315 A.2d 16 (1974); *cf. Herbstman v. Eastman Kodak Co.,* 68 N.J. 1, 11, 342 A.2d 181 (1975) (suggesting that a cause of action could be predicated on an express representation or warranty made in an advertisement). In fact, the Third Circuit, upon review of advertisements introduced in this case, stated that the evidence "compellingly points to an express warranty." *Pritchard v. Liggett & Myers Tobacco Co.,* 295 F.2d 292, 296–97 (3d Cir.1961) (applying Pennsylvania law).[12]

Plaintiff has presented evidence from which the jury could conclude that Liggett's advertisements were the basis of the bargain for Mrs. Cipollone's purchase of Liggett's cigarettes. Mrs. Cipollone saw Liggett advertisements containing affirmations of fact as to smoking and health throughout the period in which she purchased Liggett's cigarettes. Whether such

affirmations, once made, are part of the bargain is a question of fact for the jury. See N.J.S.A. § 12A:2–313(1)(a), Uniform Commercial Code comment 3. "Particular reliance on [defendant's affirmations] need not be shown" in order to establish that the affirmations were part of the bargain. *Gladden v. Cadillac Motor Car Div.,* 83 N.J. 320, 325, 416 A.2d 394 (1980) (citing N.J.S.A. § 12A:2–313 Uniform Commercial Code comment 3); *see Pritchard v. Liggett & Myers Tobacco Co.,* 350 F.2d 479, 483–84 (3d Cir.1965) (applying Pennsylvania law). Liggett may rebut the presumption that plaintiff relied on defendants' statements, *see* N.J.S.A. § 12A:2–313 Uniform Commercial Code comments 3 and 8, but the evidence, at this time, does not require such a finding. Plaintiff has presented evidence that Mrs. Cipollone, despite her awareness of the risks of smoking, accepted the affirmations in Liggett's ads as true and relied upon them in continuing to smoke.

■ Plaintiff has presented evidence from which the jury could conclude that Liggett's pre–1966 conduct was a proximate cause of Mrs. Cipollone's illness and death.[13] The jury could conclude that Liggett's pre–1966 warranties proximately caused Mrs. Cipollone's pre–1966 smoking and that such smoking contributed substantially to her injuries. Furthermore, as described above, *see supra* at p. 1496, plaintiff has presented evidence from which the jury could conclude that Mrs. Cipollone's smoking after 1966 did not relieve Liggett of liability.

■ Liggett is not entitled to a directed verdict on plaintiff's express warranty claim due to insufficient notice. N.J.S.A. § 12A:2–607(3)(a) contains the notice requirement for an express warranty claim:

Where a tender has been accepted the buyer must within a reasonable time after he discovers or should have discover-

---

**12.** In light of all of the evidence, statements in Mrs. Cipollone's deposition that Liggett's advertisements *did not contain* warranties would not preclude the jury from finding that Liggett had made such warranties.

**13.** That plaintiff smoked two Liggett brands during this period does not support the granting of Liggett's motion. Plaintiff has presented evidence that Liggett's warranties proximately caused Mrs. Cipollone's injury.

ed any breach notify the seller of breach or be barred from any remedy.

New Jersey courts have not yet applied this provision in the context of an express warranty claim against a remote manufacturer who was not the immediate seller of the product. However, for alternative reasons, the court holds that Liggett is not entitled to a directed verdict on this ground.

First, the court predicts that the New Jersey Supreme Court would find that notice of breach was not required in this case. The Supreme Court held that the previously applicable Uniform Sale of Goods law did not require notice of defective merchandise in an action against a manufacturer who was not the immediate seller of the product. *See Santor v. A & M Karagheusian, Inc.*, 44 N.J. 52, 67–68, 207 A.2d 305 (1965). The Supreme Court would likely rule in the same fashion on the new provision. At the least, New Jersey would follow other courts who have ruled that § 2–607(3)(a) requires a buyer to give notice only to his immediate seller. See *Palmer v. A.H. Robins Co., Inc.*, 684 P.2d 187, 206 (Colo.1984); *Goldstein v. G.D. Searle & Co.*, 62 Ill.App. 3d 344, 19 Ill.Dec. 208, 211, 378 N.E.2d 1083, 1086 (1978). Liggett has not raised the defense of lack of notice to plaintiff's immediate seller. *See Goldstein*, 19 Ill. Dec. at 212–13, 378 N.E.2d at 1087–88 (stating that a remote manufacturer may raise lack of notice to the immediate seller as a defense); *see also Owens v. Glendale Optical Co.*, 590 F.Supp. 32, 36 (S.D.Ill.1984) (applying *Goldstein* to deny summary judgment due to defendant's failure to raise this defense).

■ Alternatively, even if this provision required plaintiff to give notice to Liggett, plaintiff has presented evidence from which the jury could conclude that the filing of plaintiff's complaint constituted notice within a reasonable time. Several courts have held that the filing of a com-

plaint may constitute sufficient notice under this provision. *See, e.g., Graham v. Wyeth Laboratories*, 666 F.Supp. 1483, 1499–1500 (D.Kan.1987); *Goldstein*, 19 Ill. Dec. at 213–14, 378 N.E.2d at 1088–89. As for timing of the notice, the provision requires notification within a reasonable time after plaintiff "discovers or should have discovered any breach"—in this case, after plaintiff discovered she had lung cancer in 1981. Plaintiff has presented evidence from which the jury could conclude that the filing of the complaint was within a reasonable time thereafter, in light of all of the circumstances. *See* N.J.S.A. § 12A:1–204(2) (stating that, under the Code, "[w]hat is a reasonable time for taking any action depends on the nature, purpose, and circumstances of such action").[14]

The court denies Liggett's motion for a directed verdict on plaintiff's express warranty claim.

### b. Philip Morris and Lorillard

Plaintiff, in opposing defendant's motion for summary judgment acknowledged that "his claims against defendants Lorillard and Philip Morris for breach of express warranties are preempted." Brief in Opposition to Defendants' Motions for Summary Judgment at 8 n. 17. Plaintiff made no argument that any express warranty claim against these defendants remained. Nonetheless, plaintiff now contends that he has viable "pre–66" express warranty claims against these defendants. Plaintiff's Brief in Opposition to Defendants' Motions for Directed Verdict at 12.

■ The court, assuming that plaintiff has not waived any pre–1966 warranty claim against these defendants, concludes that plaintiff has not presented evidence to support such claims. Plaintiff identifies affirmations of fact made in 1954 by these defendants. The court concludes, as a matter of law, that these affirmations were not

---

**14.** The court notes in this regard that the commentary to the Code provision on "reasonable time" states that "the rule of requiring notification is designed to defeat commercial bad faith, not to deprive a good faith consumer of his remedy." Uniform Commercial Code Comment

**4.** Additionally, the court notes that whether defendant was prejudiced by the lack of notice is also a relevant consideration. *See Goldstein,* 19 Ill.Dec. at 213, 378 N.E.2d at 1088 (*citing Pritchard v. Liggett & Myers Tobacco Co.,* 295 F.2d 292, 298 (3d Cir.1961)).

"part of the basis of the bargain" when plaintiff purchased Philip Morris products in 1968–1974 and Lorillard products after 1974. N.J.S.A. § 12A:2–313(1)(a). Furthermore, pre–1966 warranties by these defendants were not part of the basis of the bargain between Mrs. Cipollone and Liggett.

The court grants the motions of Philip Morris and Lorillard for a directed verdict on plaintiff's express warranty claims.[15]

### 4. Negligent failure to research and test

■ Plaintiff alleges an independent cause of action based on defendants' failure to engage in reasonable research and testing as to the health consequences of smoking. Defendants contend that any claim based on such a failure is subsumed in plaintiff's failure to warn or alternative design claims.

The court concurs with defendants. Plaintiff has presented ample evidence from which the jury could conclude that defendants failed to engage in reasonable research and testing of their product. This evidence is relevant to plaintiff's claim that defendants failed to warn plaintiff of the scientifically knowable risks of cigarettes and plaintiff's claim that defendants failed to develop and market a feasible alternative design.[16] However, plaintiff has presented no evidence from which the jury could conclude that this failure harmed Mrs. Cipollone in any independent fashion. Plaintiff contends that the issue of "wheth-

er these defendants exercised due care in marketing their product without adequately testing for its health hazards" separates this theory from plaintiff's other claims. However, absent a showing that defendants' inactions resulted in a more dangerous product (either because of a lack of warning or safer design), plaintiff has suffered no actionable injury.[17]

The court grants defendants' motions for directed verdict on plaintiff's independent negligent research and testing claims.[18]

### 5. Intentional tort/conspiracy

■ Plaintiff alleges that each defendant is liable for intentional fraud or misrepresentation. In New Jersey, fraud or misrepresentation consists of the following elements: 1) a material misrepresentation of a presently existing or past fact; 2) knowledge of the falsity by the person making the misrepresentation; 3) intent that the misrepresentation be relied upon; 4) justifiable reliance of the misrepresentation; 5) resultant damage. See, e.g., B.F. Hirsch v. Enright Refining Co., Inc., 751 F.2d 628, 631 (3d Cir.1984); Enright v. Lubow, 202 N.J.Super. 58, 72, 493 A.2d 1288 (App.Div. 1985). Furthermore, failure to disclose facts may, under certain circumstances, constitute misrepresentation. See Berman v. Gurwicz, 178 N.J.Super. 611, 619, 429 A.2d 1084 (Chancery Div.1981); Jewish Center v. Whale, 165 N.J.Super. 84, 89, 397 A.2d 712, aff'd, 172 N.J.Super. 165, 411 A.2d 475 (App.Div.1980), aff'd, 86 N.J. 619, 432 A.2d 521 (1981).[19] The critical inquiry

---

**15.** This ruling does not preclude plaintiff's intentional tort and conspiracy claims against these defendants.

**16.** Evidence that defendants deliberately conspired to avoid research and testing of their products is relevant to plaintiff's conspiracy claim.

**17.** Plaintiff contends that "had research been performed when it should and could have been, public attitudes toward smoking would have affected." Plaintiff's Brief in Opposition to Defendants' Motions for Directed Verdict at 17 n. 4. However, plaintiff has presented no evidence from which the jury could conclude that research in and of itself would have affected public attitudes, absent some duty on defendants to disclose the fact and results of testing.

**18.** This court has held previously that plaintiff's negligent testing claim was not preempted because the duty to test "stands independent" from the duty to warn. Cipollone v. Liggett Group, Inc., 649 F.Supp. 664, 673 (D.N.J.1986). That statement was correct, as far as it went, because the duty to test was also relevant to plaintiff's alternative design claim. However, the court—to the extent that it held that plaintiff could present an independent claim based on negligent testing—reconsiders its prior ruling.

**19.** Plaintiff acknowledged at oral argument that his claims for suppression of information held by third parties are part of his fraudulent concealment claim. The court adheres to its prior ruling that claims premised on suppression of information held by third parties are not preempted because such suppression is not

in fraudulent concealment cases is whether the facts concealed are "significant and material." *Jewish Center*, 165 N.J.Super. at 89, 397 A.2d 712.

Plaintiff has presented evidence from which the jury could conclude that: 1) defendants made representations and intentionally concealed facts concerning the state of knowledge concerning the health consequences of smoking; 2) defendants knew of the falsity of these representations; 3) defendants intended that consumers, including Mrs. Cipollone, would rely on these representations to purchase cigarettes; 4) Mrs. Cipollone, under the circumstances, justifiably relied on defendants' representations in her purchases of cigarettes; and 5) Mrs. Cipollone's smoking caused her injury. Additionally, plaintiff has presented evidence from which the jury could conclude that defendants knowingly concealed facts that were significant and material to plaintiff's decisions regarding smoking.

Furthermore, as outlined by the court in its factual recitation, plaintiff has presented evidence from which the jury could conclude that defendants conspired to misrepresent and conceal facts regarding the dangers of smoking. See supra at pp. 1490, 1493. Under the "well-settled law of civil conspiracy," defendants may be found jointly and severally liable for damages caused by the acts and products of their co-conspirators. *See, e.g., Nicolet, Inc. v. Nutt*, 525 A.2d 146, 147 (Del.1987).

As stated in connection with plaintiff's express warranty and failure to warn claims, Mrs. Cipollone's continued smoking after appearance of the congressionally mandated warnings in 1966 does not, as a matter of law, relieve defendants of liability. See supra at pp. 1496, 1497.

The court denies defendants' motion for directed verdict as to plaintiff's intentional tort and conspiracy claims.

6. *Punitive damages*

■ Plaintiff, in order to recover punitive damages, must demonstrate "inten-

tional wrongdoing in the sense of an 'evil minded act' or an act accompanied by a wanton and wilful disregard of the rights of another." *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 97 N.J. 37, 49, 477 A.2d 1224 (1984); *see Fisher v. Johns–Manville Corp.*, 103 N.J. 643, 655, 512 A.2d 466 (1986). If the jury accepts the plaintiff's version of the facts as to the conduct of the defendants, it is difficult to envision a more compelling case for an award of punitive damages.

The court denies defendants' motion for a directed verdict on plaintiff's claims for punitive damages.

CONCLUSION

The court grants defendants' motions for a directed verdict on plaintiff's alternative design claims.

The court grants the motions of Philip Morris and Lorillard for a directed verdict on plaintiff's failure to warn and express warranty claims. The court denies Liggett's motion as to these claims.

The court grants defendants' motions for a directed verdict on plaintiff's claim for negligent failure to research and test, as an independent claim.

The court denies defendants' motions for a directed verdict on plaintiff's intentional tort and conspiracy claims.

The court denies defendants' motion for a directed verdict on plaintiff's claims for punitive damages.

SO ORDERED.

---

"promotional" activity. *Cipollone v. Liggett Group, Inc.*, 649 F.Supp. 664, 674 (D.N.J.1986). Thus, this aspect of plaintiff's intentional tort claims covers conduct occurring before and after 1966.